STATE OF TENNESSEE

*v.*

GREELEY JONES.

385 S.W.2d 80.

(*Knoxville,* September Term, 1964.)

Opinion filed December 11, 1964.

RAY H. JENKINS, Knoxville, EDWARD F. HURD, Newport, C. FRANK DAVIS, Morristown, for Greeley Jones.

GEORGE F. McCANLESS, Attorney General, EDGAR P. CALHOUN, Assistant Attorney General, for the State.

MR. SPECIAL JUSTICE ROBERT S. CLEMENT delivered the opinion of the Court.

The Plaintiff in error, hereinafter referred to as the Defendant or by name, was indicted for murder in the first degree for the killing of Dorothy Ballard. He was convicted of voluntary manslaughter and sentenced to not less than two (2) nor more than three (3) years in the penitentiary. The deceased was formerly married to the Defendant, but they were divorced, and the deceased married one Ballard, a nephew of the Defendant, who was a boarder in the Jones' home prior to the divorce of the deceased and the Defendant. However, the deceased divorced Ballard about four (4) months prior to her death. One child was born to the Defendant and the deceased, a boy who was about eleven (11) years of age at the time of the trial of this cause. The parties lived in the Russellville section of Hamblen County, Tennessee, where the crime was committed.

The Sheriff of Hamblen County, Deward Trent, testified that he received a call on the night of May 25, 1963, about 10:00 P.M., and that from the information obtained, he went to the home of Dorothy Ballard. When he arrived at the home, the deceased was lying on a sofa in the front room of her house, and that she was dead at the time of the Sheriff's arrival. Sheriff Trent testified that he talked to Judy Turner, a young lady about twenty-one (21) years of age, who was spending the night at the home of Dorothy Ballard the night she was murdered. From information obtained from Judy Turner, the Sheriff went to the home of Ernest Jones, where he arrested the Defendant. He carried the Defendant to the Hamblen County jail at about 10:30 P.M. and charged him with murder. The Defendant denied that he killed his former wife when he was taken into custody by the Sheriff and has continued to deny same relying on an alibi at the trial of this cause.

The Defendant offers the following assignments of error:

(1) The testimony in this case preponderates in favor of the innocence of the Defendant and against the verdict of guilty as found by the jury;

(2) The Trial Court erred in sustaining the Attorney General's objections to certain questions concerning the trade, occupation or profession of State's witness, Judy Turner;

(3) The Court erred in permitting the Attorney General to ask the Defendant if he had not paid a fine for liquor violation;

(4) The Court erred in denying counsel for Defendant the right to ask the Defendant if this fine was not paid in the JP Court;

(5) The Court erred in permitting the Sheriff on rebuttal to testify that Judy Turner told him the night of the killing the same story that she testified to at the trial;

(6) The Court erred in excluding Defendant's counsel's question as to threats made against the deceased on the morning of the day she was killed.

Before considering the assignments of error, it might be helpful to consider the activities of the deceased and Judy Turner on Saturday, May 25, 1963, the day of the death of Dorothy Ballard. Judy Turner and Dorothy Ballard were evidently close friends and had known each other for some time. Miss Turner testified that she frequently spent the night at the home of the deceased, and that she had been at the deceased's home since Thursday of the week that Dorothy Ballard was killed. She testified

that she and the deceased, together with Sam Jones, the brother of the Defendant, began drinking about 7:30 on Saturday, May 25th; that the three of them drank a half pint of gin at 7:30 A.M. She testified that the next drink that she had was about 11:00 A.M., at which time, she drank some whiskey in Morristown. She and the deceased were riding around in a Lincoln Continental which belonged to the deceased. There was more drinking throughout the day of beer and whiskey, the witness and the deceased both participating. She further testified that about 7:00 or 7:30 P.M., they drank some moonshine whiskey with Sam Jones with whom they had drunk a half pint of gin early Saturday morning. Miss Turner testified that she and the deceased went to the home of the deceased about 9:00 P.M. and that the last drink she had was about 7:30 with the exception of one beer.

Upon arriving at the Ballard home, Miss Turner stated that she went to bed in a front bedroom with her niece who was six (6) years of age. That after about ten minutes, she heard a car pull in the drive from the alley in the direction of where Sam Jones lives. That after the car stopped, she heard the back door to the house open and she saw a person coming into the house whom she identified as the Defendant. That this person came through the hall and went into the bathroom; that he came out of the bathroom and came to witness's bedroom, turned on the light, turned it off, and walked into the living room where the deceased was lying on a couch. That she heard the following conversation:

"Q. Did you hear what he was saying to Dorothy?

"A. He did ask her who was in the bed.

"Q. And what, if anything, did Dorothy say?

"A. She said, 'That's Judy' and he said, 'Well, who's with her?', and she said, 'That Kathy Waldren's little girl.'

"Q. Now, did you hear him say anything else?

"A. He said something else but I couldn't make it out.

"Q. Did you hear Dorothy say anything else?

"A. Yes.

"Q. And what did she say?

"A. 'Why don't you go on down and pick up old Clary or Clara', I am not for sure which one it is.

"Q. 'Why don't you go on down and pick up old Clara or Clary?'

"A. (Nods yes).

"Q. And did you ever hear her say anything after that? Say anything after she said that?

"A. No.

"Q. And did Greeley Jones say anything after that time?

"A. No.

"Q. After she stated that, did you hear anything else?

"A. No. I heard the gun shot.

"Q. And how many shots if you know.

"A. There was four but I wasn't sure at the time, it happened so fast.

"Q. Now, when you heard the gun shot did you see Greeley Jones after you heard the gun shot.

"A. (No answer).

"Q. Or did you hear anything, the door shut or anything?

"A. Oh, I heard the back door open and close.

"Q. And how long was it after you heard the gun shots was it until you heard the back door open and close again?

"A. Just a matter of seconds.

"Q. Did you at anytime see the automobile in the driveway?

"A. (Nods No)."

■ The jury had the opportunity of seeing, hearing and observing this witness as she testified in open Court. And although her character is somewhat blackened in the record, the jury determined her credibility as a witness and decided the issue against the Defendant, and we cannot say that the verdict preponderates in favor of the innocence of the Defendant. *Carroll v. State,* 212 Tenn. 464, 370 S.W.2d 523. *Cooper v. State,* 123 Tenn. 37, 56-61, 138 S.W. 826; *Turner v. State,* 188 Tenn. 312, 219 S.W.2d 188.

Assignment of error No. 1 is overruled.

Assignment No. 2 complains of the action of the Court in sustaining the Attorney General's objections to certain questions concerning the trade, occupation or profession of State's witness, Judy Turner. The substance of the question was whether the witness had a trade, occupation or profession; whether the witness worked and whether she had been in a dance hall on certain nights and danced

with blacks and whites, and whether the witness had worked as a call girl at the Plantation Club.

 In considering this assignment of error, it must first be recognized that the latitude which may be allowed counsel in cross-examination is largely within the discretion of the Trial Court. *Dennie v. Isler,* 8 Tenn.App. 1 (1928); *Mutual Life Ins. Co. v. Moore,* 26 Tenn.App. 297, 171 S.W.2d 414 (1942); *Landrum v. Callaway,* 12 Tenn.App. 150 (1930).

In Caruthers, History of a Lawsuit (8th ed.) 355 at page 406, the following is set forth as the rule governing cross-examination of witnesses:

"It is held that on cross-examination a witness may be asked about specific acts, including indictments involving moral turpitude, which disclose his conduct, antecedents and character, and thereby tend to affect and injure his credibility, although they may reflect upon and disgrace the witness; and the answers of the witness to such collateral matters are conclusive, and cannot be contradicted. But, as a general rule, a witness may refuse to answer any question where the answer would incriminate him."

This statement of the Tennessee rule, as we shall see, is correct except as to indictments where the witness is the defendant in a criminal prosecution.

The leading case in this State, as to what is the proper subject of cross-examination of a witness, is *Zanone v. State,* 97 Tenn. 101, 36 S.W. 711 (1896). In that case, as in the one at bar, questions were propounded to the prosecution witnesses on cross-examination. These questions involved acts of bigamy and lewdness by the witnesses.

214

In reversing the judgment, upon a conviction of murder, the Court, per Allen, Special Justice, said:

"There is no good reason why a witness may not be asked on cross-examination questions touching his present situation, employment, and associates, if they are of his own choice; as, for example, in what house or family he resides, what is his ordinary occupation, and whether he is intimately acquainted and conversant with certain persons, and the like. However these may disgrace him, his position is one of his own selection. A witness, on cross-examination, may be asked any questions throwing light on his or her moral character, provided they involve moral turpitude, whether they relate to domestic relations or other habits, if the tendency is to show that the witness is guilty of wanton habitual violation and disregard of the most sacred marital relations, or of the law, or of the rules of decent society, involving the witness in moral turpitude; as, for example, if the witness has more than one living husband or more than one wife at the same time, or if the witness has been or is then, employed in a house of ill fame." 97 Tenn. 117-118, 36 S.W. 715.

In *Cooper v. State*, 123 Tenn. 37, at 226, 138 S.W. 826, at 877 (1909), it was said:

"As a general proposition it may be said that it is legitimate to ask the witness with regard to anything which bears upon the particular issue, or which tends to show his moral character, in so far as it will enable the jury to determine the question of his reliability— in other words, the measure of faith or credit his statement under oath is entitled to."

However, the trend of late, where the witness involved is the defendant in a criminal prosecution, has been to

limit the scope of inquiry on collateral matters. The case of *Brooks v. State,* 187 Tenn. 67, 77, 213 S.W.2d 7 (1948), held that where a defendant took the stand as a witness, he could not be cross-examined about pending indictments.

In the case of *Davis v. Wicker,* 206 Tenn. 403, 333 S.W.2d 921 (1960), it is stated:

"If specific acts are to be inquired about, which are not relevant to the issues, for the purpose of affecting credibility, they must be of such a nature as to tend to have that effect."

In *Posley v. State,* 199 Tenn. 616, 288 S.W.2d 455, it is stated by Chief Justice Neil:

"Now as I understand from reading the opinion in the Brooks case, *Zanone v. State* is not overruled in its entirety. But cross-examination must be confined to crimes (1) where a defendant, or the witness, has been convicted, and which admittedly involves moral turpitude; and (2) his character wherein he has committed offenses contrary to accepted standards of decency and morality, but which may not necessarily be subject to criminal prosecution."

■ Under the foregoing authorities, we feel that it would have been error for the Trial Judge to have refused to permit the witness to answer the question whether or not she had acted to serve as a call girl at the Plantation Club which would have reflected on her credibility as a witness. However, the Court relented and limited the question to six months prior to the time of the crime. We think this cured any error that might have been made by an absolute refusal. The question and answer appears as follows:

"Q. I am asking you whether or not at any time within six months of May 25, 1963, you acted and served and worked as a call girl at the Plantation Club in Cocke County.

"A. No.

"Q. Did you at any time within a year?

"GENERAL WITT: WE OBJECT IF YOUR HONOR PLEASE.

"Q. Within a year?

"THE COURT: THE OBJECTION IS SUSTAINED."

Later counsel for the Defendant limited his question to a period of nine months prior to May 25, 1963, and the objection of the Attorney General to this question was sustained. In other words, the Court permitted the question to be asked, but restricted the time to a period of six months prior to the alleged crime. The Trial Judge had broad discretion in the scope of cross-examination and we do not believe he abused his discretion when he permitted the question to be asked, but limited same to a period of six months prior to the alleged crime.

Assignment of error No. 2 is overruled.

■ Assignments No. 3 and 4 relate to a fine which the Defendant had paid for violation of the liquor laws. First, in permitting the Attorney General to ask Defendant if he had not paid a fine and denying Counsel for the Defendant the right to ask Defendant if a fine that he had paid for violation of the whiskey laws was not paid in the J. P. Court. The Defendant had on direct examination testified that he had never been indicted or convicted. Certainly, the State had a right to question the Defendant

about such a statement whether or not the whiskey violation was one which involved moral turpitude. The Defendant admitted that he had paid a fine on a whiskey case, but that he was not guilty of the charge. The Trial Judge would not allow either side to go further into the matter. Although the question asked by the State may not have involved moral turpitude, we feel that the question was proper on a cross-examination. The Defendant put his record at issue when he took the witness stand and testified that he had never been indicted or convicted of a crime.

Assignments of error No. 3 and 4 are overruled.

■ Assignment No. 5 insists that it was error to allow the State to ask the Sheriff in rebuttal, the following questions:

"Q. Sheriff, did you talk to Judy Turner the night of the killing?

"A. Yes.

"Q. Sheriff, what did she tell you?

"A. Exactly the same thing she testified today."

In *Sutton v. State,* 155 Tenn. 200, 291 S.W. 1069, we find the following:

"While the general rule is that witnesses cannot be corroborated by proof of previous consistent statements, where a witness has been assailed on the ground that his story is a recent fabrication, or where he has some apparent motive for testifying falsely, under well-recognized exceptions, proof that he gave a similar account of the transaction when the motive did not exist, and before the effect of such an account could be

foreseen, is admissible. See 40 Cyc. 2789, citing many cases, including *Glass v. Bennett,* 89 Tenn. 478, 14 S.W. 1085; *Hays v. Cheatham,* 6 Lea, 1; and *Nashville, etc., R. R. Co. v. Lawson,* 105 Tenn. 639, 58 S.W. 480. An examination of these cases sustain this statement of the exception to the rule. In the last cited case the authorities are reviewed by Mr. Justice Wilkes, and in a later case, (*Legere v. State,* 111 Tenn. 368, 77 S.W. 1059, 10 Am.St.Rep. 781) Mr. Justice Beard distinguishes the authorities, and emphasized that confirmatory evidence of this character should be admitted only when the 'statements were made at a time when no motive existed to misrepresent the facts.'

"It is thus well established in this state that consistent statements made before a motive to speak falsely can fairly be attributed to the witness, are admissible, where it is charged that the evidence of the witness is a recent fabrication, the result of some relation to the party or case. This exception to the general rule is recognized by Mr. Greenleaf, as quoted in the opinion of *Dossett v. Miller,* 3 Sneed, 76. And, while confirmatory statements are never admissible until the witness has been in some way impeached—until his credibility is in issue—the exception is applied when the attack upon the testimony of the witness has been made in the form of cross-examination only. *Railroad v. Lawson,* supra, and see note, citing many authorities bearing upon the degree and nature of the impeachment necessary, in 41 L.R.A. (N.S.) p. 877."

The record reveals that the credibility of State's witness, Judy Turner, had been assailed and there was testimony that she had made statements inconsistent with her testimony and we feel that it was proper for the Sheriff

to be allowed to testify that she told him the same story on the night of the killing that she did from the witness stand. Assignment of error No. 5 is overruled.

■ Assignment of error No. 6 complains of the exclusion of certain alleged threats on the life of the deceased to Mrs. Delia Young and Mrs. Henry Potter. In the absence of the jury these witnesses testified as follows:

"Dorothy (the deceased) came the morning of the day she was killed to take me to Morristown. She told me that some woman called her over the telephone that day and threatened to kill her."

Mrs. Delia Young, the mother of the deceased, testified, in the absence of the jury, that she was babysitting for her daughter, Dorothy, three days before her daughter was killed. That she answered the telephone at Dorothy's house and some woman said, "You old Russellville whore I am going to kill you".

In 40 C.J.S. Homicide sec. 220 at page 1133, we find the following statement:

"For the purpose of showing that another than accused committed the crime, evidence of disconnected threats and declarations of third persons is inadmissible, but such evidence is admissible where the threats and declarations are part of the res gestae or form links in a chain of evidence connecting with the crime itself."

Wharton on Criminal Evidence, Article 200, at pages 403-404, states:

"Threats by third persons against the victim of a crime are not relevant, unless the third person is an accomplice, or an accessory, or acting in concert with the accused; unless the threats of the third person are

part of the res gestae; or unless the threats are uttered in the presence of the accused and are such as to require a denial, which he fails to make."

In *Colquit v. State,* 107 Tenn. 381, 387-388, 64 S.W. 713 (1901), the Defendant sought to show that some third party came to his house after midnight, aroused the people, and asked to see the Defendant, refusing to give his name—all of which was calculated to put Defendant in fear. The Court held the evidence inadmissible unless deceased could be connected with these visits.

Based on the foregoing authorities, we believe that the Trial Judge was correct in excluding the testimony of Mrs. Young and Mrs. Potter. It, therefore, follows that all assignments of error are overruled and the judgment of the Trial Court is affirmed.