## WILBURN E. SMITH, Plaintiff in Error, v. STATE OF TENNESSEE, Defendant in Error.

### 452 S.W.2d 669.

Court of Criminal Appeals of Tennessee. Nov. 26, 1969.

On Rehearing Dec. 16, 1969.

Certiorari Denied by Supreme Court March 16, 1970.

H. H. Gearinger, Chattanooga, for plaintiff in error.

David M. Pack, Atty. Gen., Arnold Peebles, Jr., Asst. Atty. Gen., Nashville, Jerry Foster, Asst. Dist. Atty. Gen., Chattanooga, for defendant in error.

## OPINION

DWYER, Judge.

Wilburn E. Smith appeals from a conviction of murder

in the first degree with a resulting sentence of confinement for ninety-nine years in the State Penitentiary. This verdict, as found, was returned by a jury in the Criminal Court of Hamilton County.

Defendant attacks the validity of the judgment entered against him and files assignments of error.

These errors are summarized:

1. The Court erred in not granting the defendant a continuance in order for him to be examined by a doctor of defendant's choice.

2. The Court erred in not submitting special requests tendered to the jury and denying motion for special findings and verdict by the jury.

3. The Court erred in approving the verdict of the jury in that it is contrary to the law and contrary to the weight and preponderance of the evidence.

To evaluate the assignments of error a recitation of the facts is a necessity.

The defendant, Wilburn E. Smith, on the 23rd day of September, 1967, entered the home of his former father-in-law and shot and killed the husband of his ex-wife.

The homicide occurred in the living room of Howard Roy Morgan, who resides in the Falling Water community of Hamilton County. Mr. Morgan, along with his son, daughter and the deceased, were watching television when the defendant entered the home and started firing a 22-automatic riffle at the deceased, who was sitting on the couch. Eight shots struck the deceased with one entering the chest area, causing death. The elder Mr.

Morgan and his son grabbed the rifle and a struggle ensued, which resulted in their obtaining possession of the weapon. During the struggle the defendant related to the elder Morgan that he was not going to hurt either one of them. He further related to Mr. Morgan, "Well, it looks like you have always wanted to kill me." He testified that he had known the defendant since he was a strip of a boy and through the years when he had been married to his daughter. He related that he had smelled the odor of alcohol on the defendant's breath when they were wrestling for control of the weapon but that he was not drunk. He related that defendant had been by the home earlier, around 6:30 p.m., to see his children and that defendant was not intoxicated but had been drinking. His son, Eugene, relates in substance as his father testified. He stated that during the struggle for the weapon his sister, defendant's ex-wife, came into the room and defendant stated, "D-a-m, you're next." He also relates that defendant said to them that "he didn't come there to hurt them." He stated defendant was there earlier in the evening and had not been drinking. He related he had known the defendant through the years and had seen him drunk and sober and had smelled odor of alcohol on defendant when they were struggling for the gun, but that defendant was not drunk. The defendant's daughter testified she was in a back room of the house with her mother when she heard the shots, ran into the living room, saw her daddy had shot her step-daddy, and ran out of the house to a neighbor's house. She relates that her father came into the neighbor's house and she heard him tell the neighbor, "I told you I was going to get him." Mrs. Joyce Hankins Sparks, defendant's ex-wife, testified she heard the shots, ran into

the living room, and saw that her husband had been shot. The defendant was struggling with her father and brother when he made the statement to her, "You're next." She related defendant had been drinking. She could tell by his eyes. She further related that as a result of this shooting, her sister, who had been in the living room at the time, was now a mental patient. She relates that defendant had previously struck her one time when she was in the hospital and had cut up a coat her mother had given her. Mr. Grady Perry, the neighbor, testified that the defendant entered his home and stated, "I've shot Frank. Do you care if I stay here 'til the law comes?" He related that he had known defendant all of his life and been drunk with him. His observation of the defendant was that he talked all right, walked nice and could not say whether he was drunk or not; and, that defendant had asked him for a drink of water and if he could turn down the television and turn the lights off. The deputies who responded to the call testified that defendant met them when they pulled into the area of the shooting; that defendant told them he had shot Frank Hankins, had shot him pretty bad, five or six times; and, that he had had it on his mind. They both testified defendant was not drunk. One related he had arrested defendant before for being drunk, and that defendant on this occasion stated, "Ask me anything you want," (in reference to the killing). The chief of detectives testified that he talked to the defendant on the evening in question and he could smell the odor of alcohol on his breath, but that the defendant talked all right and walked all right.

The defendant testified and, in substance, recounted

his past life. He talked of the two marriages to his ex-wife; that he had been drinking since he was fifteen years old and could not stop, although he had tried; that he had been hospitalized because of drinking; and, that he had suffered a blow about his head which caused him to have headaches. When he would visit his three children they would not be properly clad and seemed to be hungry; that when he would go to see the children, the deceased would sit on the couch sharpening a big knife. Prior to the shooting he had been on a drinking spree for three days and all he remembered was his former father-in-law shaking him and telling him he had shot Frank; that the rifle belonged to his brother-in-law, Eugene Horne, with whom he lived; that he remembers going to jail and being charged with first degree murder and talking to the chief of detectives; that since he had been in jail he had been sent to Central State Psychiatric Hospital and examined by doctors; and, that when his ex-wife remarried it hurt him to see another man have his children. He also testified that he hired an attorney the day after he shot Frank Hankins. The defendant called Vernon Miranda, who testified he had been on leave from the Army and he and defendant had been drinking together three days prior to the shooting. The last time he had seen the defendant was around 4:00 p.m. on the date of the homicide and defendant was intoxicated, but knew what he was doing. Another witness, Eugene Horne, brother-in-law of defendant, testified defendant had been living with him and that defendant had drinking problems. He stated that he had, on one occasion, taken him to a hospital because of his drinking and that the rifle belonged to him and his son had told him that Wilburn had gotten it from off the wall

the day of the homicide. He had seen defendant about 5:00 p.m. on the 23rd day of September and the defendant was drinking at that time. Defendant, on a prior occasion, had told him about his children not having the things they should. A sister of defendant testified that defendant had been a drunk since he was fifteen years old, and that he had been hospitalized one time because of drinking. Another sister testified that defendant had had a drinking problem since he was fifteen years of age. A nephew testified that he had seen the defendant on the day of the homicide come into his father's house and get the rifle off the wall; that he had seen his uncle (defendant) in the house at 8:00 o'clock in the morning on the 23rd day of September and that he was drunk; that defendant got the rifle around 8:00 p.m. and that he was drunk and staggering; that he saw defendant drive off spinning, almost hitting a tree, and, that it was ten miles from his home to the Morgan residence, scene of the homicide.

The State, in rebuttal, called Dr. William H. Tragle, a psychiatrist, Superintendent of Central State Psychiatric Hospital, who testified that defendant was in the hospital under observation by the staff for a month; that it was his opinion and the staff's opinion that at the time they observed the defendant he was not suffering from any form of insanity; and, that in his opinion there was nothing to indicate from their examination that the defendant did not know right from wrong when he committed the offense on September 23, 1967. On cross-examination, in response to questions about prolonged drinking and the resulting damage to cells in the brain, the doctor testified that the only positive way of determining such

damage, in his opinion, would be the microscopic examination of the brain. They were familiar with the reports of the hospital in Florida in which the defendant had been a patient because of drinking. He was asked if defendant had been given a pneumoencephalographic test (spinal fluid taken from the cavities of the brain into which air is injected which then casts a shadow on the X-ray film, which characteristics of the sizes and shapes of the shadowed cavities are then studied and certain inferences may be drawn as to damage, tumors, etc.). The doctor was of the opinion that this test was not necessary; that their examination, which included an electroencephalograph, (an apparatus for detecting and recording brain waves) did not indicate any damage to that part of the brain which we use to think; that because of this test, they did not feel that a pneumoencephalograph test was called for; and, that they did not find sufficient clinical reason to think that defendant's brain had suffered any damage from drinking. We further related on cross-examination that he would not have made any more extensive examination of the defendant if he had been hired as a private psychiatrist to examine defendant. The defendant entered a special plea of temporary insanity or insanity at the time of the commission of the offense. He did not call and offered no expert medical witnesses.

Defendant assigns as error that the Court erred in not granting him a continuance in order to allow a Dr. Boehm to examine the defendant. The record reveals that the homicide occurred on the 23rd day of September, 1967. The indictment was returned on November 22, 1967. The defendant testified that he hired an attorney the day after the shooting; that several continu-

ances of the case had been asked for and granted by prior privately retained counsel in the case; and, that present privately retained counsel entered and undertook the defense six months prior to the trial date, March 12, 1969. The record reflects that the Court had granted a continuance in February in order for the defendant to assemble expert scientific witnesses to testify for the defense. The record further reveals that the Court had reassigned, on motion of the defense, the case for trial March 12, 1969. On March 4, 1969, on motion of the defendant, the Court entered an order for the defendant to be examined by a Dr. Boehm, neurosurgeon, practicing in the City of Chattanooga. On the date of trial the defendant, not in accordance with the rules of Court, moved the Court again for a continuance based on the unavailability of Dr. Boehm. The following took place between the Court and defense counsel at that time as to why the examination had not been performed in the time the order was entered and the day of trial:

"MR. GEARINGER: We don't have much alternative, Your Honor. But what I'm saying is that my conscience will be weighed, that if Dr. Walter Boehm, and I must take some disagreement with Your Honor's statement. Dr. Walter Boehm believes in this scientific proof. The question yet to be resolved is, on the basis of his skill and knowledge, does he find any mental defect. He agrees it's possible. He agrees that these tests are scientifically provable, but the point is that he has agreed to do it, is willing to do it, wants to do it, but has not yet done it.

"THE COURT: Why hasn't he done it, since we reassigned this case last month for that very purpose?

"MR. GEARINGER: That's right, Your Honor.

"THE COURT: And Dr. Boehm does not run this court.

"MR. GEARINGER: I know he doesn't.

"THE COURT: So why, if he's so interested in it, why hasn't he arranged to have this done?

"MR. GEARINGER: Your Honor, that I don't know. But I do know that each day when I call, I get answering service, or I get the word, "He's in surgery.' Now, I have this same difficulty, and I'm sure Your Honor remembers when you were down here in this spot and not on the bench, in damage suits, of getting doctors in here. I don't like doctors to run our courts either, but I don't know how to get Dr. Boehm to do that which he has agreed to do, except when he can do it."

In the exchange it is apparent that counsel for the defense did not know and could not say when Dr. Boehm would be available to make the examination. The prior order entered in February, when the case was reassigned to March 12, 1969, was to give defendant an opportunity to amass expert medical witnesses. It is apparent from a review of this record that the defense attorney did not and could not say when the doctor would conduct the tests. In view of the many continuances and the amount of time from the date of the offense to the trial a total of eighteen months had elapsed.

██  It is elementary that a motion for a continuance is addressed to the sole discretion of the trial judge, and that his judgment will not be disturbed in the absence of a clear showing of prejudicial abuse of his discretion.

Bass v. State, 191 Tenn. 259, 231 S.W.2d 707. There is no clear showing in this record that the defense was prejudiced by the Court not continuing this case again, especially in view of Dr. William H. Tragle's testimony that the electroencephalographic test showed no damage to the area of the brain of the defendant which we use to think.

In defendant's motion for a new trial he alleged tests have, subsequent to the trial, been performed by Dr. Boehm. There is no showing by affidavit or otherwise that any test performed by Dr. Boehm would be any other evidence than contradictory or impeaching of Dr. William Tragle. In fact, there is a complete lack of showing that any test or examination of the accused subsequent to the trial would have affected in any manner the court's ruling on the question of defendant's criminal responsibility. We find no abuse by the Court in its action in denying defendant's motion for a continuance. The assignment is overruled.

Defendant assigns as error the insufficiency of the evidence to sustain the verdict and that it is contrary to the law. A review of the record reflects there is a sufficiency of evidence in the record to sustain the verdict of the jury and the verdict, as returned by the jury, is supported by the law. In this record there is found that the defendant had a previously-formed design to kill, as evidenced by the defendant obtaining the rifle some ten miles removed from the scene of the killing, driving over to the home of the deceased, entering, firing the rifle, hitting deceased eight times, stating during the struggle over the rifle to his ex-wife, "You're next," also stating to the former father-in-law and his son during this strug-

gle for possession of the rifle that "he didn't come there to hurt them," then going next door stating, "I told you I was going to get him," and telling the arresting officers he shot Hankins pretty bad. These are some of the proven facts in this record which show that defendant had a previously-formed design to kill Hankins. It also shows that at the time of the killing he was not intoxicated to the extent that he was unaware of what he was doing; in fact, they show a complete awareness of what he was doing. The verdict of the jury has resolved adversely to defendant his contentions of fact that he was intoxicated at the time of the killing. The verdict of the jury has resolved adversely to the defendant his contention that he did not remember anything about the slaying because of his having been on a drinking spree for three days. There is a complete absence of proof in this record that defendant's use of intoxicants through the years has caused a condition of settled insanity to exist. In fact, the witnesses called by the defense, his relatives, refute the fact that defendant was incapable of distinguishing between right and wrong. They relate he was and had been hospitalized on an occasion because of drinking. They also relate he had and was capable of making his way. He had expressed a dislike of the prevailing conditions his children were in by being in the home of the deceased. Defendant's use of intoxicants, as evidenced in this record, does not and could not prevail to excuse him from his criminal responsibility in committing this crime. To hold otherwise would permit organized, orderly society to be at the mercy and whims of persons who voluntarily drink and then when they commit a crime, to excuse them on the premises that they had a habit they could not or would not control or that they did not re-

member, when all the evidence in the case clearly showed that the defendant was not drunk and was completely aware of what he was doing and what he had done. The theory of the defense in this case is (1) the defendant was drunk and did not know what he was doing; and (2) his use of intoxicants *might have damaged* his brain to some extent, which would not make him criminally responsible. In Atkins v. State, 119 Tenn. 458, 105 S.W. 353, we adopt herein the language of Mr. Justice Crabbe, quoted in that opinion:

"* * * The history of criminals and criminal trials shows that he who has not learned betimes to restrain the evil inclinations of our nature—envy, malice, revenge, and their kindred passions—but has a sufficiency of moral sense left to deter him from the commission of enormity while sober, will often 'screw his courage to the sticking point' by the free use of ardent spirits, and, thus made able to silence the twinges of his conscience, will voluntarily imitate the demon. But let courts once approve the doctrine now contended for, and it will not be resorted to as a plea by persons of this description alone; but even the cold-blooded, calculating assassin will never be a sober homicide. He will always exhibit himself at the bar of a court of justice as a specimen of insanity produced by drunkenness. And thus this degrading and disgraceful, yet too common, vice, instead of being hunted from society as the bane of good morals and social and domestic happiness, will be converted into a shield to protect from punishment the worst of crimes. All civilized governments must punish the culprit who relies on so untenable a defense; and in doing so they preach a louder lesson of morality to all those who are addicted to

intoxication, and to parents and to guardians, and to youth and society, than 'comes in the cold abstract from pulpits.'

"'In order to be clearly understood, we have supposed the strongest case—a case of entire prostration of intellect immediately occasioned by drunkenness—and have said that that constitutes no excuse. Instances, however, of heinous offenses, committed under such circumstances, are believed to be of rare occurrence. They are much oftener the result of that midway state of intoxication which, although sufficient to stimulate the evil-disposed to actions correspondent with their feelings, would not excite the good man to criminal deeds. It is generally the drunken man acting out the sober man's intent. He says and does when drunk what he thinks when sober."

■ All factual questions are and were resolved by the jury in this case. We will not interfere or interpose our judgment into this province. The failure of the defendant to remember is, in itself, no proof of his mental condition when the crime was committed. Thomas v. State, 201 Tenn. 645, 301 S.W.2d 358.

The verdict concludes the jury found premeditation the necessary element for first degree murder to be present in this record. In Clarke v. State, 218 Tenn. 259, 402 S.W.2d 863, may be found the following language:

"Whether premeditation is present in a given case is a *question of fact to be determined by the jury from all the circumstances of the case,* such as the use of a deadly weapon upon an unarmed victim. * * *" (emphasis added)

In Edwards v. State, 221 Tenn. 60, 424 S.W.2d 783, 785, our Supreme Court had this to say:

"* * * This Court has many times held that the elements of premeditation and deliberation may be inferred from the circumstances of the killing. In Bass v. State (1950) 191 Tenn. 259, 231 S.W.2d 707, the Court said:

'Both premeditation and deliberation may be inferred from the circumstances of a homicide. While wilful killing with a deadly weapon is not a sufficient basis for an inference of premeditation and deliberation, it is seldom that the evidence in a case of homicide is restricted to no more than these bare facts and it is commonly the case that the jurors have before them other circumstances from which they may infer the existence or the want of the mental elements of premeditation and deliberation.' "

We, therefore, find the verdict of the jury is not contrary to the law. Therefore, defendant's assignments as to the sufficiency of the evidence and the verdict being contrary to the law are accordingly overruled.

Defendant next contends that this Court should set aside and discard the M'Naghten rule (right and wrong) announced 126 years ago and adhered to in this State for nearly one hundred years, beginning with Dove v. State, 50 Tenn. 348. Defendant urges this Court to set aside the M'Naghten rule for more *enlightened measures*. He urges this Court to adopt holdings in United States v. Smith, 404 F.2d 720 (6th Cir.) wherein the Court

adopted the American Law Institute's test of criminal responsibility. The test or charge to be submitted and sought to be brought into our law by the defendant is enumerated on page 727 of United States v. Smith, *supra*.

■ This is an intermediary court in the state system as comparable to the Sixth Circuit being in that capacity in our Federal system of courts. In United States v. Smith, *supra*, the following language is to be found:

> "A Supreme Court holding directly in point on the issue of criminal responsibility would, of course, foreclose our consideration of any alternative."

We are bound by the rulings and holdings of the Supreme Court of our State. In Spurlock v. State, 212 Tenn. 132, 368 S.W.2d 299, the following language may be found:

> "* * * Until a definitely superior rule of law is presented and enacted by the Legislature, perhaps Tennessee will, in the words of Anderson [Andersen] v. United States, [9 Cir.], 237 F.2d 118, 'trudge along the now well-traveled pike blazed more than a century ago by M'Naghten.' "

The assignment of error is accordingly overruled. The charges, as requested by the defendant and refused by the trial court, in view of this Court's action in overruling the defendant's last assignment of error, are therefore found to be without merit.

It, therefore, follows that all assignments of error being found wanting, it is the judgment of this Court that the judgment entered against the defendant in the trial court is affirmed.

RUSSELL and MITCHELL, JJ., concur.

## ON PETITION TO REHEAR

DWYER, Judge.

The defendant has filed a courteous petition to rehear. He relies in his petition to rehear on two grounds, namely: (1) The trial court abused its discretion in not granting defendant a short continuance in order to secure medical testimony for the defense; and (2) the trial court erred in not charging requests bottomed on the American Law Institute's test of criminal responsibility.

Counsel for the defendant presents no new matter of law or fact overlooked by this Court when we overruled defendant's assignment of error pertaining to the trial court's action in not again granting defendant a continuance. As set out in our opinion, presently-retained counsel and previously-retained counsel had secured a number of continuances in the trial court. Assignment of error number one in the petition is again accordingly overruled.

In defendant's second assignment he again asked this Court to set aside the M'Naghten rule adhered to in this State as the test for criminal responsibility. Defendant in his petition states this Court was in error when we said in our opinion, quoting from Spurlock v. State, 212 Tenn. 132, 368 S.W.2d 299, that only one state and but two Federal circuits had abandoned the M'Naghten rule. We are, as we were then, well aware that since Spurlock v. State, *supra,* other Federal circuits have abandoned the M'Naghten rule. This Court was *not* in error but there was an erroneous assumption on the part of the defen-

dant as to that fact. It is apparent from this petition, as well as from the record, that counsel for the defendant does not like nor agree with the M'Naghten rule. In reference to the antiquity of the M'Naghten rule, he says we should not look to the past for wisdom, for that would be like looking in a rearview mirror. Neither should we decide our present by what might be in the future because that would be chaotic indeed. In City of Paris, Tennessee v. Paris-Henry County Public Utility District, 207 Tenn. 388, 340 S.W.2d 885, 890, the following language may be found:

> " ' "The office of a petition to rehear is to call the attention of the court to matters overlooked, not to those things which the counsel supposes were improperly decided after full consideration" (Louisville & N. Railroad Co. v. United States Fidelity & Guaranty Co., 125 Tenn. 658, 691, 148 S.W. 671, 680). Gulf, M. & O. R. Co. v. Underwood, 182 Tenn. 467, 476, 187 S.W.2d 777, 780; Colbaugh v. State, 188 Tenn. 103, 112, 216 S.W.2d 741.)' Delta Loan & Finance Co. of Tenn. v. Long, [206] Tenn. [709], 337 S.W.2d 606, 607."

A petition for rehearing should never be used merely for the purpose of rearguing the case on points already considered and determined, unless some new and decisive authority has been discovered which was overlooked by the court. There has been no new matter of law or fact presented in this petition to rehear which was overlooked or not considered by this Court when it rendered its opinion. Therefore, respectfully, the petition to rehear is denied.

RUSSELL and MITCHELL, JJ., concur.