Jimmie WILLIAMS, Jr., Plaintiff-in-Error,

v.

STATE of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

May 4, 1976.

Order on Petition to Rehear June 22, 1976.

Certiorari Denied by Supreme Court Sept. 7, 1976.

Marvin J. Brode, Memphis, for plaintiff in error.

R. A. Ashley, Jr., Atty. Gen., John F. Southworth, Jr., Asst. Atty. Gen., Nashville, Hugh Stanton, Jr., Dist. Atty. Gen., John A. Irvine, Asst. Dist. Atty. Gen., Memphis, for defendant in error.

DAUGHTREY, Judge.

### OPINION

The defendant, Jimmie Williams, Jr., was convicted by a Shelby County jury of murder in the first degree and sentenced to thirty years imprisonment.

On appeal the defendant raises multiple assignments of error, which present six issues for our determination: (1) the sufficiency of the evidence to support a verdict of first degree murder; (2) the deliberate spoliation by the State of an exhibit to the record; (3) the alleged prejudicial effect of an improper question asked by the prosecution of the defendant on cross-examination; (4) the court's alleged error in admitting certain photographs into the record without a proper foundation; (5) the allegedly erroneous charge to the jury on the "law of flight"; and (6) the court's alleged error in

permitting introduction of the victim's purported dying declaration into the record, while at the same time denying the defendant his right to attempt impeachment of that statement.

■ The evidence produced at trial, which lasted three days, involved the testimony of over twenty witnesses. There were serious discrepancies between the evidence produced by the prosecution and that offered by the defendant, who maintained that the shooting which caused the victim's death was accidental in nature. Indeed, there were factual discrepancies in the testimony of the various witnesses for the State. But the jury had the duty of resolving any inconsistencies in the evidence, and their verdict reconciles all such material discrepancies in favor of the State. *Monts v. State,* 218 Tenn. 31, 400 S.W.2d 722, 731 (1966); *Graves v. State,* 489 S.W.2d 74, 84 (Tenn.Cr.App.1972). In attacking the sufficiency of the evidence on appeal, the defendant must prove that the evidence preponderates in his favor and against the verdict of the jury. *McBee v. State,* 213 Tenn. 15, 372 S.W.2d 173 (1963). We have closely reviewed the record, and we think that the defendant has failed to carry his burden on this point, based on the totality of the evidence before the jury.

The victim, Velma Gant Ford, died on the kitchen floor of her Memphis, Tennessee home on July 26, 1973 from a single .22 calibre gunshot wound to the upper abdomen and chest. A deputy medical examiner testified that the bullet entered to the right side of her upper abdomen, transversed the liver, heart and one lung, and finally lodged in the victim's left arm. He testified that the wound was a "contact wound," *i.e.* when fired the muzzle of the gun was against the victim's body.

Under the State's proof, the victim and two friends had spent the evening of July 25, 1973 at the Soulville Lounge, where the victim got into an argument with one Marie Hatter. Hatter was there with the defendant, with whom she had been living off and on during the previous two years. The

victim had also cohabited periodically with the defendant during the same period of time. The relationship they shared can best be described as stormy.

After the argument between Hatter and the victim, the defendant exchanged some words with the victim, who then called the police to the Soulville Lounge. The police interviewed several people in the parking lot, and after they left a fight ensued between the victim and the defendant. The testimony concerning who started the fight and its extent was conflicting, but it appears from the testimony of one disinterested witness who had tried to break up the fight that the defendant hit and kicked the victim repeatedly. It also appears that the victim tore the defendant's shirt during this time. The defendant's wrath was finally diverted to the intervenor, who fled in his car with the defendant in pursuit. According to the testimony of her friends and family members, as a result of the fracas the victim's mouth was bloody and her eye and face swollen. However, the medical examiner noticed no apparent facial bruises the next day when he conducted the autopsy.

After the fight the defendant went to his home, which was located across the street and two doors up from the house where the victim was living with her family. It appears that he armed himself with a long-barrelled .22 calibre single-shot target pistol, and went to the victim's house. According to the statement the defendant gave the police just after his arrest, he went to "scare Velma" into leaving him alone. At trial the defendant denied this purpose, and said that he went to the victim's house to ask her not to call the police anymore, and took his pistol with him for self-protection against her family.

The victim had not arrived home when the defendant first went to her house, so he returned home and sat on his front porch with Marie Hatter and awaited the victim's arrival. Some twenty minutes later the victim got home and the defendant went back to her house for the second time,

pushed his way past her brother who was standing on the front porch, and confronted the victim in the living room. What then occurred is a matter of sharp dispute between the State's witnesses and those for the defendant.

According to the prosecution witnesses, the shooting was witnessed by two people inside the house at the time: one of the victim's brothers and his friend, Dorothy Dickerson. They testified that the disheveled victim had been crying and talking about calling the police when the defendant arrived. The victim and the defendant exchanged heated words on this subject, the defendant complaining that the victim had "called the police on him" too many times in the past, that it had cost him a lot of money, and that he would kill her if she called the police again. The victim insisted she was going to contact the police and moved toward the phone. The defendant apparently repeated his threat and then pulled his pistol and shot her. The State's witnesses by their oral testimony placed the defendant and victim some five feet apart standing on either side of a doorway between the living room and a bedroom. According to them the victim screamed, "Jimmie, you killed me, you shot me." She then staggered through the bedroom and into the kitchen where she collapsed and died at about 1:30 A.M. on the morning of July 26, 1973. On cross-examination both these witnesses denied that there was any struggle before the gun went off.

The defendant testified in his own behalf that there was no one inside the victim's house when the shooting occurred. He said that he was trying to reason with the victim but that she threatened him, saying "I told you the next time I saw you with Marie I was going to kill you." He testified that she grabbed his gun out of his belt, that he took hold of the barrel, and that as they struggled the gun went off accidentally. He admitted that the gun had to be cocked before it could be fired, denied that it was cocked when he brought it into the house, but said that he didn't see the victim

cock the gun before it went off. He further testified that after the shooting he picked the gun up, heard the victim say she was shot, and immediately left the house thinking she was not seriously hurt. He went home, got in his car with Hatter and a cousin, and fled. He was arrested before he got out of the city limits, and at that time told police he was going to Somerville, Tennessee to get his mother to look after his house because he knew he would be arrested. The .22 pistol was recovered from the car.

The defendant insists that the medical testimony regarding the nature of the wound supports his theory that the gun discharged accidentally during a struggle, and rebuts the charge of first degree murder. He concludes that the trial judge should have directed a verdict on this charge, and that on appeal the evidence fails to support the jury verdict. We find this argument unpersuasive. The medical testimony is not entirely inconsistent with the testimony of other State witnesses. While the verbal description of the distance between the victim and the defendant would tend to negate the possibility of a contact wound, the marks put on a diagram of the scene by the State's chief eyewitness actually placed the defendant and the victim within two and one half feet of each other at the time of the shooting, making the resulting contact wound quite plausible. Furthermore, there was ample evidence of premeditation and deliberate design to kill on the part of the defendant. Several witnesses testified to previous beatings inflicted on the victim by the defendant and described occasions upon which he had pulled a gun and threatened to kill her. The jury was entitled to find evidence of premeditation in his repeated armed trips to the victim's home in search of her just prior to the shooting. Finally, we note that the defendant's attempt by his testimony to establish the absence of any eyewitnesses to the shooting was impeached by his statement to the police at the time of his arrest, in which he said that the same two eyewitnesses produced by the State at the trial were in fact inside the victim's house when she was shot.

Finding that the weight of the evidence fails to preponderate in the defendant's favor, and that the trial court committed no error in refusing to direct a verdict of not guilty, we overrule all those assignments of error which relate to the form and sufficiency of the evidence at trial.

■ On the issue of the alleged spoliation of the State's diagram of the scene, the record shows that sometime after one of the eyewitnesses had begun testifying at the original trial of this case, a mistrial was ordered on the defendant's motion. In preparation for the retrial, the prosecutor erased certain marks put on the diagram by the eyewitness indicating the location of various people who were inside the house at the time. The defendant insists that this deliberate erasure had the effect of depriving him of effective cross-examination in the subsequent trial and that it constitutes "affirmative evidence of the weakness of the prosecution" under *United States v. Remington,* 191 F.2d 246, 251 (2nd Cir. 1951) and similar cases. This latter conclusion is correct as a matter of law, provided the circumstances of the act manifest bad faith on the part of the prosecution. *See generally,* McCormick, *Evidence* § 273 (2d ed. 1972). We think the record fails to demonstrate the requisite bad faith. The diagram consists of a drawing of the scene on a large piece of cardboard. The cardboard is covered with heavy transparent plastic, upon which grease pencil marks were made by the witnesses. Marks made at the first trial were wiped off prior to the second trial, in an obvious attempt to avoid any suggestion to the witnesses.

■ Even if the prosecutor's action here is interpreted to give rise to an inference of weakness, the defendant would at most be entitled to a jury charge on this issue, which he failed to request as required by T.C.A. § 40–2517. In the absence of a special request, the trial court will not be held in error for failure to instruct the jury

on what is clearly a non-fundamental error. *Turner v. State,* 188 Tenn. 312, 219 S.W.2d 188 (1949); *Arterburn v. State,* 208 Tenn. 141, 344 S.W.2d 362 (1961).

■ Regarding the effect of the erasure on the defendant's right of cross-examination, the record shows that defense counsel subjected both eyewitnesses to stringent cross-examination regarding allegedly inconsistent statements previously given under oath. But there is no indication in the record that there was a discrepancy between marks on the diagram made by witnesses at the first trial, and those made at second trial. We therefore think the defendant has failed to demonstrate any prejudice arising from the alleged spoliation of this exhibit and we overrule this assignment of error.

■ The defendant next complains of a question propounded on cross-examination of the defendant regarding his admitted relationship with a neighborhood girl whom the prosecution implied was thirteen years old, and the defendant insisted was sixteen. Taken in context, we think the line of questioning was within the bounds of proper cross-examination and further that it was properly limited by the trial court's ruling. *State v. Jones,* 215 Tenn. 206, 385 S.W.2d 80, 83–84 (1964).

■ The defendant also alleges error in the admission of certain photographs of the victim's house, but we find no merit in this contention. The record reflects that a proper foundation was laid for the introduction of the photographs in question.

■ In an attack on the instructions to the jury, the defendant assigns as error the court's charge on the permissible inference to be drawn from the defendant's alleged flight following the shooting. We have reviewed the charge and determined that it is a correct statement of the law. The issue was legitimately raised by the evidence at trial. Therefore, the court committed no error in connection with this charge.

Finally the defendant challenges the admissibility of the victim's statement: "Jimmie, you killed me, you shot me." The defendant first complains that the statement constitutes hearsay. A timely objection was entered at trial and the prosecution argued in response that the statement was admissible under both the res gestae and the dying declaration exceptions to the hearsay rule. The trial court overruled the defendant's objection [1] and allowed the two eyewitnesses to the shooting to repeat the victim's statement.

■ We find no error in the court's ruling because the statement, made spontaneously and contemporaneously with the event, meets the requirements of both the excited utterance ("res gestae") and the dying declaration exceptions to the rule against hearsay. *See generally,* McCormick, *Evidence* §§ 281–287, 288, 297 (2d ed. 1972).

We are troubled, however, by the court's refusal to allow the defendant an opportunity to impeach the victim's statement. Defense counsel submitted as an offer of proof an "Affidavit of Perjury" executed by the victim in November 1969, some four years prior to her death and at a time when she was approximately sixteen years old. This document was part of the record in a separate criminal case against the victim's brother. The affidavit was sworn to and its contents were in direct conflict with sworn testimony which earlier had been given by the victim in the 1969 trial.[2]

■ The victim's affidavit constitutes hearsay if offered to prove the truth

---

1. Difficulty in the transcription of this record produced numerous gaps attributed to "inaudibility." On this particular ruling the bill of exceptions recites only: "Court overruled objection. Court gives reasons." Thus it is impossible to discern whether the statement was admitted as an excited utterance, a dying declaration, or both. The trial judge charged the jury on the law pertinent to dying declarations; no corresponding instruction on res gestae utterances would seem to be required.

2. The victim had testified as an eyewitness for the State at her brother's felony-murder trial. After his conviction, she executed a sworn

of its contents, but it would not be considered hearsay if used for the purpose of impeachment. Put another way, the affidavit would be inadmissible hearsay if offered to prove the truth of the declarant's statement "I am a perjurer." But it would be admissible to show that the declarant had made conflicting statements under oath, from which the jury could infer that she was in fact a perjurer, without regard to which of her two inconsistent sworn statements was true. This observation is important, because the law is clear that a dying declaration may be impeached in the same manner that the declarant could have been, had she or he been testifying in person. 2 *Wharton's Criminal Evidence* § 347 (13th ed. 1972); 5 Wigmore, *Evidence* § 1446 (Chadbourn Rev. 1974); *McPherson v. State,* 17 Tenn. 279 (1836); *Morelock v. State,* 90 Tenn. 528, 18 S.W. 258 (1891).[3] We think under this rule the victim's statement was subject to impeachment on the basis of a prior act directly related to her veracity.

 On the other hand, the law is equally clear that an excited utterance is not subject to impeachment. 2 *Wharton's Criminal Evidence* § 317 (13th ed. 1972). And the "res gestae" statement of a declarant otherwise incompetent to testify is admissible under the excited utterance exception to the hearsay rule. *See, e. g. Couch v. State,* 93 Tex.Cr.R. 27, 245 S.W. 692 (1922) (*dictum*); *Jones v. State,* 111 Tex.Cr.R. 172, 11 S.W.2d 798 (1928). The rationale behind the divergence in the two rules is well-stated in the *Jones* case and bears on the result we reach here:

> There exists an obvious distinction between a dying declaration and a res gestae statement. In the one case a sense of impending death takes the place of an

oath, and the law regards the declarant as testifying, while in the other it is the event itself which speaks. The one may therefore be impeached as the evidence of any witness may be, but the other is inanimate. It is the transaction speaking as distinguished from the witness. Res gestae is in law regarded as the actual facts expressing themselves through the mouth of a witness. Reasons underlying and which permit the admission of res gestae statements preclude the idea that they may be impeached by proof of contradictory statements of declarant made at a time and under circumstances which render them hearsay. The following quotations from the rules and principles governing the admission of res gestae statements will illustrate this:

> "The general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to actual sensations and perceptions already produced by the external shock." Wigmore, Evidence, § 1747.

> "The utterance must have been made while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance." Wigmore, Evidence, § 1750(b).

> "The admissibility of res gestae statements is not dependent at all upon the veracity of the declarant because he is not regarded as a witness but as merely the passive instrument through which the event itself speaks." Encyclopedia of Evidence, vol. 11, p. 294.

> "In some cases the res gestae principle is distinguished from the principle in-

---

statement for his lawyer, recanting her testimony and saying that she had not been at the scene of the crime, knew nothing of the details, but had been coerced by the Memphis police into testifying against her brother.

**3.** Both *McPherson* and *Morelock* involved impeachment by use of declarant's other state-

ments, inconsistent with the content of the purported dying declaration and made either prior or subsequent thereto. Our research has revealed no reported cases in Tennessee or elsewhere involving the impeachment of a dying declaration by proof of a prior perjurious act.

volved in the admission of dying declarations. In the latter the apprehension of immediate death takes the place of the oath, while in the former it is the spontaneity of the statement and the fact that it is the transaction itself speaking which renders the declaration admissible. In one the declarant is regarded as a witness, the truth of whose declaration is guaranteed by the effect on the mind of declarant of the realization of approaching death. In the other declarant is not looked upon as a witness but merely as the instrument through which the transaction voices itself." Encyclopedia of Evidence, vol. 11, p. 296. 11 S.W.2d at 799–800.

■■■■ Thus the purpose behind the rule permitting impeachment of a dying declaration is to test the declarant's reliability. Here that need is supplied by the trustworthiness inherent in the spontaneity of the contemporaneous and excited declaration. Therefore we feel that any error committed by the trial judge in failing to admit the impeaching evidence was harmless.

This conclusion is further buttressed by the facts surrounding the declaration. It was not a statement made sometime after an unwitnessed act, as is often the case with a dying declaration, but was made simultaneously with the act and both the act and the statement were observed and later described by the two eyewitnesses. Under such circumstances the victim's statement as an item of evidence can be considered cumulative in nature. We think the court's failure to allow impeachment of the statement had no effect on the result in this case.

Finding no reversible error, we affirm the judgment of the trial court.

WALKER, P. J., concurs.

GALBREATH, Judge (dissenting).

Without belaboring the point I would hold that the senseless killing described in the record and majority opinion resulted from passion and anger that was still influencing the actions of the defendant at the time he shot the deceased. I would reduce to second degree murder.

Was the mind of the defendant at the moment of the slaying so far free from the influence of excitement, or passion, as to be capable of reflecting and acting with a sufficient degree of coolness and deliberation of purpose; and was the death of the person assaulted the object sought to be accomplished—the end determined upon? This question as set out by the Supreme Court in a number of cases, including *Clarke v. State*, 218 Tenn. 259, 402 S.W.2d 863, must be answered in the affirmative before a killing, presumed otherwise to have been murder in the second degree, can be lawfully held to have been murder in the first degree.

The State's proof plainly shows that the object sought to be accomplished or the end determined upon by the defendant was to convince the deceased that she should not report him to the police again. When she moved towards the telephone with the announced intention of frustrating the end determined upon by the defendant he reacted in an angry, emotional and heated fashion. He killed where a less impassioned person would not have done so.

For the reasons touched on above I respectfully dissent.

ORDER ON PETITION TO REHEAR

DAUGHTREY, Judge.

■■■ The appellant has filed a petition to rehear that raises substantially the same questions treated in our opinion. In this regard, he has failed to meet the prerequisites of a petition to rehear. Rule 32, Rules of the Supreme Court of Tennessee, adopted by this Court, 2 Tenn.Cr.App. 746 (1967); see also *Smith v. State*, 2 Tenn.Crim.App. 192, 452 S.W.2d 669 (1969), *cert. denied* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

Additionally, the contention is made that there occurred in this case a violation of the

rule announced in *Farris v. State,* 535 S.W.2d 608 (Tenn.1976). Upon a review of this record, we find that no *Farris* question was raised in the trial court, and therefore, under the holding in *Farris,* the appellant is entitled to no relief in this Court.

The petition to rehear is denied.

WALKER, P. J., concurs; CHARLES GALBREATH, Judge, who dissented in part to majority opinion but concurs here.