IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 12, 2005 Session

## STATE OF TENNESSEE v. STANLEY PHILLIP CHAPMAN

**Direct Appeal from the Circuit Court for Tipton County**
**No. 4717     Joseph H. Walker, III, Judge**

_____

**No. W2004-02404-CCA-R3-CD  - Filed November 2, 2005**

_____

The appellant, Stanley Phillip Chapman, was convicted by a jury in the Tipton County Circuit Court of second degree murder.  He received a sentence of twenty-two years incarceration in the Tennessee Department of Correction.  On appeal, the appellant raises several issues for our review, including the trial court's evidentiary rulings and sentencing.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

C. Michael Robbins, Memphis, Tennessee, for the appellant, Stanley Phillip Chapman.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; Colin Campbell and James Walter Freeland, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

In November 2003, the Tipton County Grand Jury indicted the appellant for the second degree murder of his wife, Amanda Chapman.  At trial, the State's proof revealed that at approximately 3:00 a.m. on July 15, 2003, deputies from the Tipton County Sheriff's Office were dispatched following reports of a disturbance at 5808 Highway 59 West, Apartment A in Bulison. En route, police were informed that a shooting had occurred at the residence.  The appellant had called 911 to report that he had accidentally shot the victim.

Upon arrival at the residence, police noticed the appellant standing outside of the apartment, screaming, "I didn't mean to do it.  Help."  Deputy Jeff Thompson placed the appellant in his police

cruiser while the remaining officers proceeded into the residence. The appellant asked Deputy Thompson about the victim's condition, but the deputy was unable to provide any information. Shortly thereafter, the appellant told Deputy Thompson that he had taken an overdose of Xanax pills. Deputy Thompson drove the appellant to the hospital for treatment for his alleged overdose. On the way to the hospital, Deputy Thompson asked the appellant why he had taken the pills. The appellant responded that he had taken the pills because he had just shot his wife, and he wanted to die.

When Deputy Daniel Walls walked into the living room of the Chapmans' residence, he discovered the victim lying on the floor. She had been shot in the neck. The Chapmans' five-year-old son, Hunter Phillip Chapman, was standing just a few feet away from the victim. Hunter was dressed in a white T-shirt and underwear. Deputy Walls shielded Hunter's eyes and escorted him out to Deputy Walls' police cruiser. While in the cruiser, Hunter told Deputy Walls that the appellant did not intend to shoot the victim. Hunter said that he saw the victim point a gun at the appellant, the appellant grabbed the gun, they struggled, and the gun went off. Hunter told Deputy Walls that the noise of the gun scared him, and he ran back into his bedroom. Contrary to what he told Deputy Walls on the night of the shooting, Hunter testified at trial that he was in bed at the time of the shooting, but he was awakened by the noise of the gun.

The victim was transported to the hospital where she was pronounced dead. Dr. Teresa Allen Campbell performed the autopsy on the victim's body. She noted that the bullet entered the left lower anterior neck at 56.5 inches above the heel and 1.3 inches left of the midline of the body. The bullet exited the victim's back at 47 inches above the heel and 1.9 inches left of the midline. The stippling on the body indicated that the shot occurred from a distance of less than two or three feet away. Dr. Campbell noted that there was gunpowder in the victim's teeth. She also reported that the victim's blood toxicology screen was negative for alcohol or drugs.

Investigator Richard Nessly arrived at the scene of the shooting at approximately 3:45 a.m. on July 15, 2003, shortly after the victim had been transported to the hospital. Other officers were already on the scene. Deputies Thompson and Walls apprised Investigator Nessly that the victim had been found in the living room and that she had been shot. While the deputies watched the appellant and Hunter, Investigator Nessly entered the appellant's residence where he saw a .38 caliber Smith and Wesson revolver and a microcassette recorder near where the victim was found. The revolver was capable of holding six rounds; the gun held three live rounds and one spent shell. There were two small holes in the kitchen cabinet located just off of the living room. The holes were apparently caused by bullet fragments. There was another bullet hole in the living room carpet. Investigator Nessly opined that when the victim was shot, the bullet struck the floor and ricocheted up. Additionally, there was a bullet hole in the left armrest of the couch in the living room.

At approximately 6:00 a.m. on July 15, 2003, Investigator Nessly went to the hospital. He was informed by hospital personnel that the victim had died. Investigator Nessly then encountered the appellant in the emergency room of the hospital. The appellant inquired as to the status of the victim. Investigator Nessly did not inform the appellant at that time of the victim's demise. Instead, the investigator told the appellant that they would talk about the victim later.

Soon thereafter, the appellant was transported to the jail. Investigator Nessly spoke with the appellant at the jail at 7:20 a.m. on July 15, 2003. At that time, Investigator Nessly told the appellant that the victim had died as a result of the gunshot. The appellant began crying. The appellant informed Investigator Nessly that he had taken methamphetamine, "a drink," and Xanax pills. Investigator Nessly observed that the appellant appeared to be under the influence, but he was not incapacitated. Nevertheless, Investigator Nessly, following his personal policy in dealing with intoxicated subjects, decided to postpone interviewing the appellant for eight hours. He explained that he wanted to give the intoxicants in the appellant's system time to dissipate.

At approximately noon, the appellant asked a jailer to let him speak with Investigator Nessly. However, Investigator Nessly waited until 4:00 p.m. to speak with the appellant. At that time, the appellant was informed of his <u>Miranda</u> rights, and he signed a waiver of those rights. During the interview, the appellant stated that within the week prior to the death of the victim, he "got mad" and fired a bullet into the couch. The appellant and the victim were both sitting on the couch at the time he opened fire. The appellant retrieved the spent bullet from the couch and kept it "on the stand of the bed in the master bedroom." Police later searched the appellant's residence and discovered the bullet where the appellant said it would be. Investigator Nessly noticed scratches on the appellant's arms and asked when the scratches occurred. The appellant told Investigator Nessly that the day prior to the victim's death, he and the victim argued about their finances, and he choked her. The victim scratched the appellant during the altercation.

Regarding to the morning of the victim's death, the appellant told Investigator Nessly that he came home after taking a propane tank to the Chapmans' former residence. The victim had planned to take a bath while he was gone. When the appellant returned to the apartment, he saw a revolver laying on the computer desk in the living room. The victim walked past the appellant in the direction of the entertainment center. The appellant picked up the gun and asked the victim about it. As she turned toward him, the gun went off. Investigator Nessly recalled, "Throughout the interview his story changed so many times that at one time it sounded like he was saying he didn't mean to, and others, in my opinion, he did, based on some of the other things he told me."

The appellant told Investigator Nessly that he had suspected that the victim was having an affair. Therefore, he began leaving a cassette recorder at various places in the apartment. The appellant stated that the last time he recorded the victim was "that night," and he had left the recorder in the bathroom under some clothes. However, at the time of the interview, the appellant was unaware of the current location of the recorder. Investigator Nessly testified that police discovered a microcassette recorder containing an audio tape in the Chapmans' living room. The auditory quality of the tape was poor; therefore, the tape was sent to a laboratory for enhancement. Shelton Robinson performed the enhancement. Once the recording was enhanced, the events that were recorded could be heard. The enhanced version of the tape was then recorded on a compact disc (CD). The enhanced recording reflects that the appellant told the victim that he was leaving to take a tank somewhere. Then, sounds of splashing water, such as a bath, can be heard. At some point, the appellant returned home. He appeared to be angry with the victim, accusing her of cheating on him. The victim denied the appellant's accusations. The appellant asked the victim if she thought

-3-

he was playing a game. The victim denied believing that the appellant was playing a game. There was an audible metallic click on the tape and then the appellant told the victim that he was about to "end it." The victim pleaded, "Please stop." There was a loud rustle on the recording, after which the recording ended. There was still space on the tape for additional recording.

Agent Don Carman, a forensic scientist with the Tennessee Bureau of Investigation's Firearms Identification Unit, testified that the handgun found at the scene was a .38 caliber special Smith and Wesson double action revolver. Agent Carman stated that the weapon could operate either single action or double action. Agent Carman explained:

> Single action would mean that you would actually bring, manually pull, the hammer back until it cocks. Then you would pull the trigger.
>
> Or with the hammer down, you can actually just pull the trigger, and through mechanical action inside it actually brings the hammer back until it goes forward and discharges.

Agent Carman asserted that the revolver had "redundant safeties," such as an external "hammer block" and an internal "rebound safety slide." The safety features operated to prevent the firing pin from penetrating the breech face and hitting the primer of the cartridge unless the trigger was held back. "In other words, you've got to pull the trigger and actually hold it for a certain length of time."

Agent Carman explained that the amount of pressure on the trigger which was required to make the revolver fire depended upon whether the weapon was being operated single action or double action. In order to fire the revolver in single action, a person had to exert two and seven-eighths pounds of pressure on the trigger; for double action, seven pounds of pressure was required. Agent Carman acknowledged that less pressure was required on the trigger in single action mode, but the person operating the weapon would have to perform the extra step of manually pulling back the hammer of the revolver. Agent Carman conceded that through forensic examination, there was no way for him to know "that it is physically impossible that a person might unintentionally discharge a round from that weapon."

Based upon the foregoing proof, the jury found the appellant guilty of second degree murder. On appeal, the appellant raises numerous issues for our review, specifically:

> [(1)] Did the trial court err by denying the motion to dismiss the indictment based on the State's concealment of exculpatory evidence prior to the preliminary hearing and action by the grand jury[;]
>
> [(2)] Did the trial court err by denying the motion to suppress the [appellant's] statement and evidence derived therefrom[;]

[(3)] Did the trial court err by admitting evidence that the [appellant] fired the pistol into the couch some days before the fatal shooting [and] that the [appellant] engaged in an argument with the deceased within 24 hours of the fatal shooting[;]

[(4)] Did the trial court err by admitting trial exhibits 4 [the microcassette tape], 5 [the enhanced CD], [and] 25 [the CD with three looped recordings of the metallic click on the microcassette tape], and the portion of these exhibits which contains an unidentified mechanical clicking sound, over the [appellant's] objection[;]

[(5)] Did the trial court err by overruling the [appellant's] motion for mistrial based on the manipulation of trial exhibit 16 by Investigator Nessly[;]

[(6)] Did the trial court err by permitting the State to impeach an excited utterance made at the scene of the fatal shooting[;]

[(7)] Did the trial court err by overruling the [appellant's] objection to the prosecution's closing argument that the bullet found in the [appellant's] bedroom was a trophy[;]

[(8)] Did the trial court err by denying the [appellant's] request to modify Tennessee pattern instruction No. 43.04[; and]

[(9)] Did the trial court err by directing the jury to return a special verdict and by enhancing the sentence based on the special verdict[.]

## II. Analysis

### A. Dismissal of Indictment

As his first issue, the appellant asserts that "the trial court erred by denying the motion to dismiss the indictment based on the State's concealment of exculpatory evidence prior to the preliminary hearing and action by the grand jury." Prior to trial but after the preliminary hearing and the convening of the grand jury, the State disclosed to the appellant that Hunter Chapman had made a statement to Deputy Walls indicating that the shooting of the victim was accidental. Once in possession of this statement, the appellant moved the trial court to dismiss the indictment against him and to remand for another preliminary hearing. The appellant argued that he did not have Hunter's statement at the preliminary hearing in order to refute the State's presentation of probable cause evidence; therefore, he was denied the right to have a meaningful preliminary hearing. The trial court ruled that the appellant was not prejudiced by the State's failure to disclose the statement prior to the preliminary hearing. The court further determined that the appellant had received the

statement approximately two months before trial and was thus able to utilize the statement as part of his defense.

On appeal, the appellant challenges the trial court's ruling, specifically arguing:

> The issue before the court is neither whether the discovery of exculpatory evidence may justify dismissal of an indictment nor whether the State is required to present particular discoverable evidence at a preliminary hearing. Rather, the issue is whether the prosecution may withhold and conceal highly material, exculpatory evidence, which directly refutes probable cause to believe the offense of murder in the second degree is established, for eight months during which time it obtains a bindover by the general sessions court, a prohibitive bond of one million dollars, and an indictment charging murder in the second degree.

In Tennessee, the preliminary hearing serves as a critical stage of the criminal prosecution and constitutes and important defense discovery tool. State v. Graves, 126 S.W.3d 873, 877 (Tenn. 2003) (citing McKeldin v. State, 516 S.W.2d 82, 85-86 (Tenn. 1974)). The main basis for a preliminary hearing is to determine the existence of probable cause connecting the accused to the commission of the charged offense and to determine the amount of bail for bailable offenses. State v. Whaley, 51 S.W.3d 568, 570 (Tenn. Crim. App. 2000). Tennessee courts have never required that the State produce all of its witnesses, or even its best witnesses, at a preliminary hearing. State v. Waugh, 564 S.W.2d 654, 664 (Tenn. 1978). Regardless, the evidence presented by the State at the preliminary hearing must have a factual foundation and demonstrate probable cause. Id.

Our courts have also noted that while a preliminary hearing is not intended to be a discovery device, "there are inevitable discovery aspects to every preliminary hearing." State v. Willoughby, 594 S.W.2d 388, 390 (Tenn. 1980). That having been said, we note that Rule 16 of the Tennessee Rules of Criminal Procedure, the rule governing discovery, does not apply in general sessions court. Id.; see also State v. Tammy Boyd, No. W2003-02444-CCA-R9-CD, 2004 WL 541128, at *1 (Tenn. Crim. App. at Jackson, Feb. 10, 2004). As such, the appellant was not entitled to receive Hunter's statement prior to the preliminary hearing or the convening of the grand jury. Moreover, as the trial court noted, the appellant was given Hunter's statement well in advance of trial. Therefore, we conclude that the trial court did not err by refusing to dismiss the indictment based upon the State's failure to disclose Hunter's statement prior to the preliminary hearing.

### B. Motion to Suppress

The appellant's second issue concerns whether "the trial court erred by denying the motion to suppress the [appellant's] statement and the evidence derived therefrom." Specifically, the appellant argues that his statement to police was the product of an unlawful arrest. The appellant further argues that he was denied a prompt judicial determination of probable cause.

The proof at the suppression hearing and at trial revealed that in the early morning hours of July 15, 2003, Deputy Thompson was dispatched to the Chapmans' residence because of a report of a disturbance. En route, the dispatcher informed Deputy Thompson that a shooting had occurred at the residence. Specifically, the appellant had informed a 911 operator that he had "accidentally shot" his wife.

When police arrived at approximately 3:00 a.m., the appellant was standing outside the apartment, distraught and upset. The appellant said that he did not mean to shoot the victim, and he asked the officers for help. Deputy Thompson secured the appellant in the rear compartment of his police cruiser while other officers proceeded into the appellant's apartment.

Thereafter, the appellant told Deputy Thompson that he had "overdosed on some type of pill." At approximately 4:00 a.m., Deputy Thompson obtained approval from his supervisor to transport the appellant to the hospital. On the way to the hospital, the appellant laid down in the back seat of the police cruiser. Deputy Thompson asked the appellant what kind of pill he had taken, how many pills had he taken, and why did he take them. The appellant responded that he had taken "a handful of Xanax" because "he had just shot his wife and didn't want to live if she didn't."

The appellant was treated in the emergency room of the hospital. Deputy Thompson waited outside the appellant's room at the hospital for about two hours. At approximately 6:00 a.m., Investigator Nessly arrived at the hospital. He learned that the victim was dead. Subsequently, Investigator Nessly spoke with the appellant, who inquired as to the status of the victim. Investigator Nessly told the appellant that he would speak with him later about the victim.

Later that morning, at 7:20 a.m., Investigator Nessly spoke with the appellant at the Criminal Justice Center (CJC). Investigator Nessly read the appellant his Miranda rights. The appellant advised Investigator Nessly "that he was under the influence of drugs and that would affect his statement." As was his personal policy, Investigator Nessly decided to wait about eight hours before questioning the appellant. At approximately noon, the appellant sent word that he wished to speak with the investigator. At a little after 4:00 p.m., Investigator Nessly met with the appellant. He told the appellant that he had heard that the appellant wanted to speak with police. Investigator Nessly again read the appellant his Miranda rights, and the appellant signed a waiver of those rights. Thereafter, the appellant gave a statement in which he admitted that he shot the victim, saying that it was an accident.

On appeal, the appellant argues that his statements to Deputy Thompson and Investigator Nessly should have been suppressed. The appellant contends that his statements were the product of an illegal arrest. The appellant further contends that there was an unnecessary delay in presenting him to a magistrate for an official determination of probable cause.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18,

23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

## 1. Warrantless Arrest

As his first suppression issue, the appellant contends that police seized him illegally, specifically arguing that the seizure was not supported by probable cause. The appellant further alleges that his illegal seizure tainted statements which he subsequently made to Deputy Thompson and Investigator Nessly. To address the appellant's concerns, we must first determine if and when the appellant was seized and if the seizure was legal.

In relation to the Fourth Amendment, our courts have recognized three distinct types of interactions between law enforcement and the citizenry, namely "(1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted). Moreover, "'[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968)). In other words, "a 'seizure' implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." Id. at 425. In determining when an encounter becomes a seizure, a court should consider all of the circumstances pertaining to the encounter. Id. Some relevant factors are as follows:

> the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

Id. at 426. Furthermore,

> [i]n Tennessee, an arrest is more specifically defined as the "taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual

control and will of the person making the arrest." An arrest may be affected without formal words or a station house booking. However, there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer.

State v. Crutcher, 989 S.W.2d 295, 301-02 (Tenn. 1999) (citations omitted).

On appeal, the appellant contends that he was placed under arrest within two minutes of Deputy Thompson's arrival at the scene of the crime. The State argues that the appellant was not taken into custody but was "secured" during the officers' investigation of the crime. In our view, Deputy Thompson initially detained the appellant at the scene purely for the purposes of officer safety. Police were dispatched to the site of a shooting; accordingly, police were authorized to contain the situation. See State v. Pulley, 863 S.W.2d 29, 33 (Tenn. 1993). Upon their arrival, the appellant, who was distraught and upset, informed Deputy Thompson that he needed medical treatment for an overdose. The appellant was not handcuffed and was lying down in the back of the police car on the way to the hospital. We conclude that the appellant was not in custody for Miranda purposes while Deputy Thompson transported him to the hospital for medical assistance.

Further, we note that the trial court determined that the statement to Deputy Thompson was not a result of interrogation; instead, the statement was spontaneously and voluntarily made by the appellant. We agree. After examining the record, we conclude that Deputy Thompson's question of why the appellant had taken the pills did not rise to the level of custodial interrogation. Additionally, we note that Deputy Thompson's question was merely in response to the appellant saying that he had taken an overdose. In State v. Land, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (citations omitted), this court explained:

> Custodial interrogation is limited to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." [T]he term "interrogation" refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

We conclude that Deputy Thompson was not seeking inculpatory information from the appellant when he questioned the appellant as to his reason for taking the pills. The appellant had just told Deputy Thompson that he had taken an overdose. Deputy Thompson asked the question to get further information for medical treatment. Additionally, there is no proof in the record to suggest that the appellant believed Deputy Thompson's question to be in search of incriminating material. See State v. Sawyer, 156 S.W.3d 531, 534 (Tenn. 2005). Therefore, we can find no error by the trial court in admitting the appellant's statement to Deputy Thompson.

We must next determine at what point the appellant was under arrest. Our review of the record reveals that the appellant was effectively "under arrest" at the time he was transported from the hospital to the CJC. At that point, the appellant was under police control and was not free to leave. See State v. Johnson, 980 S.W.2d 414, 422 (Tenn. Crim. App. 1998) (explaining that detention for the purpose of custodial interrogation triggers the safeguards against illegal arrest). Accordingly, the arrest needed to be supported by probable cause. See State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997).

The appellant complains that he was arrested without a warrant, and police had no probable cause. Tennessee Code Annotated section 40-7-103(a)(3) (2003) provides that an officer may arrest a person without a warrant "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." In the instant case, upon the discovery of the victim, it was probable that a homicide had been committed. Homicide, in its varying forms, is a felony. See Tenn. Code Ann. § 39-13-201, *et. seq.* (2003); see also State v. Larico S. Ficklin, No. W2000-01534-CCA-R3-CD, 2001 WL 1011470, at *7 (Tenn. Crim. App. at Jackson, Aug. 27, 2001). Thus, our next inquiry is whether police reasonably believed the appellant committed the offense. See State v. Lewis, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000). Our supreme court has explained that "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act," constitutes probable cause. State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998).

Courts should determine the existence of probable cause after assessing all of the information available to the officer at the time of arrest. See State v. Woods, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990). To this end, Tennessee Rule of Criminal Procedure 4(b) provides that in the application for the issuance of an arrest warrant, "[t]he finding of probable cause shall be based upon evidence, which may be hearsay in whole or in part provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." It has long been established that "[w]hile this rule applies itself particularly to warrants for arrest, the same principle must be considered applicable to establish probable cause where an arrest has been made without a warrant." State v. Raspberry, 640 S.W.2d 227, 228 (Tenn. Crim. App. 1982); see also State v. Tays, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992).

In the instant case, the appellant admitted that he shot the victim, albeit accidentally. Moreover, the appellant was the only adult at the scene of the crime. Further, the entrance and exit patterns of the bullet inferred lack of accident. Therefore, police had probable cause to believe that the appellant committed the homicide. Accordingly, we conclude that the arrest of the appellant was lawful. Now, we turn to the voluntariness of the statement the appellant made while in custody.

As we stated earlier, during his interview with Investigator Nessly, the appellant stated that within the week prior to the fatal shooting he got mad and fired a shot into the couch on which the victim was sitting. Additionally, the appellant and the victim argued the day prior to her death, and he choked her. The appellant stated that he believed the victim was having an affair, so he began recording her activities whenever he left the house. The night the victim was killed, the appellant

left the house while the victim bathed. The appellant said that when he returned, he found a gun on the computer desk. The appellant picked up the gun and asked the victim why the gun was out. The victim turned to answer, and the gun went off.

Generally, the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn.1998). However, if an accused is informed of his Miranda rights and knowingly and voluntarily waives those rights, he may waive the privilege against self-incrimination. Id. (citing Miranda v. Arizona, 384 U.S. 436, 444-45, 479-78, 86 S. Ct. 1602, 1612, 1630 (1966)). Additionally, the trial judge's findings of fact at the motion to suppress hearing are accorded the weight of a jury verdict. See State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981). Accordingly, the trial court's decision is binding upon this court if the decision is supported by a preponderance of the evidence. Odom, 928 S.W.2d at 22-23.

This court must consider "the totality of the circumstances to determine whether the confession is admissible." State v. Grady E. Shoffner, No. 03C01-9403-CR-00113, 1995 WL 382628, at *3 (Tenn. Crim. App. at Knoxville, June 27, 1995) (citing State v. Kelly, 603 S.W.2d 726, 728-29 (Tenn. 1980)). Accordingly, we consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). Furthermore, this court has stated:

> Coercive police activity is a necessary prerequisite in order to find a confession involuntary. The crucial question is whether the behavior of the state's officials was "such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." The question must be answered with "complete disregard" of whether or not the accused was truthful in the statement.

State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (citations omitted).

In the instant case, the trial court found that the appellant "made a knowing, voluntarily and intelligent waiver. He was in custody at the time of the incriminating statement and had been advised of his rights and signed a waiver. He freely gave the statement as testified to by the officer." We can find no proof to refute the trial court's findings. The record reveals that at the time the appellant was brought to the police station, he was under the influence of something. Accordingly, Investigator Nessly sent the appellant to a holding cell until the effects of the substance wore off. During the wait, the appellant requested to speak with Investigator Nessly. Investigator Nessly

waited additional time to ensure that the appellant was coherent. Investigator Nessly testified that when he ultimately spoke with the appellant, he advised the appellant of his <u>Miranda</u> rights, and the appellant agreed to waive those rights. Further, Investigator Nessly opined that the appellant was not under the influence at the time of the statement. Accordingly, we conclude that the appellant's statements were freely and voluntarily given.

### 2. Unnecessary Delay

The appellant's next argument for the suppression of his statements is two-fold. First, the appellant maintains that there was no timely independent judicial determination of probable cause. Secondly, the appellant contends that the lack of a timely independent judicial determination of probable cause stems from the willful or reckless false statements contained in the affidavit underlying the issuance of a search warrant.

Rule 5(a) of the Tennessee Rules of Criminal Procedure provides:

> Any person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest appropriate magistrate of the county from which the warrant for arrest issued, or the county in which the alleged offense occurred if the arrest was made without a warrant unless a citation is issued pursuant to Rule 3.5.

As we earlier stated, the appellant was arrested without a warrant at approximately 7:00 a.m. on the morning of July 15, 2003. In the event of a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to the extended detention of an individual. <u>State v. Carter</u>, 16 S.W.3d 762, 765 (Tenn. 2000). Generally, a judicial determination of probable cause is considered prompt if it is made within forty-eight hours of arrest. <u>Id.</u> The requirement of a judicial determination of probable cause is met when a valid arrest warrant is issued. <u>Id.</u> at 766. In the instant case, the record reveals that a warrant for the appellant's arrest was issued on July 16, 2003. Therefore, we conclude that the judicial determination of probable cause was promptly made.

Regardless, the appellant asserts that this determination of probable cause was faulty because Investigator Nessly willfully or recklessly made false statements in the affidavit underlying the issuance of the arrest warrant. In his affidavit, Investigator Nessly stated:

> On 07-15-03 at approximately 0310 hours, deputies of the Tipton County Sheriff's Office received a call of a shooting at 5808 Highway 59 West Apartment #A, Burlison, TN. [The appellant] had called 911 and stated he had shot his wife. Upon the officer's arrival, it was determined that [the appellant] had shot his wife, Amanda

-12-

Chapman, in the neck with a .38 caliber revolver. Mrs. Chapman died shortly afterwards.

The appellant claims that this affidavit was willfully or recklessly false because Investigator Nessly did not include the information that the appellant had told the 911 operator that he "accidentally" shot the victim. However, we conclude that Investigator Nessly did not make a false statement or a misrepresentation of the facts. In fact, even if Investigator Nessly stated that the appellant accidentally shot the victim, the appellant still essentially admitted the offense. He merely asserted a defense to the crime of homicide.

## C. Evidentiary Issues

Next, the appellant raises several evidentiary issues for our review, challenging the trial court's rulings regarding the admissibility of testimonial or demonstrative evidence.

### 1. Tennessee Rule of Evidence 404(b)

The appellant questions whether the trial court erred in allowing the State to present evidence that the appellant fired the revolver into the couch some days before the fatal shooting. The appellant also challenges the admissibility of his admission that within twenty-four hours of the fatal shooting, he engaged in an argument with the victim during which he choked her.

In the appellant's statement to Investigator Nessly, the appellant stated:

> The gun had been shot before inside of the apartment. It had been shot through that couch and into that loveseat. . . . [I]t was last week.
>
> . . . .
>
> Yes, sir. The gun had been fired, to give you an exact day, I would have to think, uhh, Thursday night . . .[t]hrough the couch and into the love seat. . . .
>
> . . . .
>
> That time I actually had lost my temper and just shot the gun.

The appellant further stated that the victim was on the couch with him when he fired the gun into the couch.

Investigator Nessly then asked the appellant the source of the scratches on his arms. The appellant replied that he and the victim "had been physically fighting at times. Uh, I don't recall an

exact time, but at some point in time yesterday afternoon I had uh, . . . I grabbed her and choked her and I asked her why she was lying to me. That's when she grabbed me."

Prior to trial, the appellant moved to have the foregoing incidents involving the victim redacted from his statement because they constituted prior bad acts. The trial court denied the motion. On appeal, the appellant argues that his statements are "not probative of any intent by the [appellant] to kill Amanda Chapman in the early morning of July 15, 2003." In response, the State argues that both pieces of evidence "establish a lack of mistake with regards to the shooting, . . . show familiarity with the weapon, and . . . show the relationship between the [appellant] and the victim prior to the murder." Specifically, the State contends that it "was entitled to establish that the level of animosity of the [appellant] toward the victim was far more serious than just an inability to get along."

Tenn. R. Evid. 404 provides:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). "A fourth prerequisite to admission is that the court find by clear and convincing evidence that the defendant committed the other crime." State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740

(Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character. In the instant case, the State argued that both prior incidents related to the lack of accident.

In its order denying the appellant's motion, the trial court stated:

> The [appellant] moved to restrict testimony concerning the alleged firing of the homicide weapon by the [appellant] into a couch where the wife was sitting a day or few days before the homicide. The State alleges that proof is probative of the [appellant's] knowledge of the weapon and the trigger pull, to rebut the [appellant's] statement of accidental shooting, and motive. The motion is denied, and the testimony allowed. [The appellant] is to renew the objection at trial if appropriate.
>
> The [appellant] moved to restrict testimony concerning an alleged heated argument within 24 hours of the alleged homicide between the [appellant] and victim, which resulted in physical contact by the [appellant] against the victim. The State alleges that proof is probative of motive, to show the relationship between the [appellant] and his wife before the shooting, and to rebut the allegations made by [the appellant] in his statement. The motion is denied and the proof allowed. [The appellant] is to renew the objection at trial if appropriate.

Obviously, the trial court failed to explicitly make the requisite findings for the admission of evidence under Rule 404(b). The court did not determine that a material issue exists other than conduct conforming with a character trait, did not determine that the probative value of the evidence was outweighed by the potential prejudice, and did not state that the evidence of the prior acts was clear and convincing. Regardless, we conclude that the trial court did not err in admitting the prior acts of the appellant.

Unquestionably, a trial court may admit evidence of prior bad acts by an accused against a victim to show intent and motive. State v. Rodney M. Spurgeon, No. E2002-00931-CCA-R3-CD, 2003 WL 22326979, at *5 (Tenn. Crim. App. at Knoxville, Oct. 9, 2003). For example, this court has previously remarked, "The relations existing between the victim and the defendant prior to the commission of the crime are relevant. These relations indicate hostility toward the victim and a settled purpose to harm or injure [the victim]." State v. Glebock, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981). Moreover, as we earlier stated, prior acts evidence is appropriate to rebut a claim of mistake or accident if such a claim is asserted as a defense. State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996).

In the instant case, the appellant asserted that the shooting of the victim was an accident. Further, in the appellant's statement to Investigator Nessly, the appellant stated that he and the victim's relationship was "real good." Therefore, we conclude that the State was entitled to produce the prior acts to refute the appellant's claims. See State v. David Kyle Gilley, __ S.W.3d __, __, No. M2003-00499-SC-R11-CD, 2005 WL 2401957 (Tenn. at Nashville, Sept. 30, 2005).

## 2. Audio Recording

The appellant next contends that the trial court erred in admitting three audio recordings purportedly made near the time of the shooting. First, the appellant challenges the admission of a microcassette recording of an argument between the appellant and the victim which was introduced as exhibit 4 at trial; a CD containing an enhanced version of the argument contained on the microcassette which was introduced as exhibit 5; and exhibit 25, a CD containing a recording of three repetitions of the mechanical click heard on the microcassette during the argument.[1] The appellant appears to contest both the authentication of the recordings and the relevance of the recordings. The appellant argues that without an express admission from the appellant as to the time the recording was made or a time stamp on the recording, the exhibits were inadmissible.

## 1. Authentication

Tennessee Rule of Evidence 901 governs the authentication of evidence. Specifically, the rule provides that authentication may be made by "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Tenn. R. Evid. 901(b)(5). Specifically, one authority has noted that

> if the witness has, at the time of testifying, adequate familiarity with the speaker's voice, he or she may opine whether the disputed testimony is the alleged speaker's voice, Rule 901(b)(5). Familiarity can be gained in a relatively short period of time, and as the result of conversations occurring before or after the conversation that was identified.

Neil P. Cohen et al., Tennessee Law of Evidence, § 9.01[7], at 9-11 (LEXIS Publishing, 4th ed. 2000). "For authentication purposes, voice identification by a witness need not be certain; it is sufficient if the witness thinks he can identify the voice and express his opinion." Stroup v. State, 552 S.W.2d 418, 420 (Tenn. Crim. App. 1977).

In the instant case, the victim's sister, Andrea Vernon, testified that the voices on the recordings belonged to the victim and the appellant. She asserted that she had been "fairly close"

---

[1] During our review, we have attempted to listen to exhibit 25. Regrettably, we were unable to hear what was purportedly recorded on that exhibit.

with her sister. Additionally, Vernon stated that she had known the appellant since 1997 and was familiar with his voice. She stated that there was no question in her mind that the voices on the recordings belonged to the appellant and the victim. Further, we can find no support for the appellant's assertion that the State must prove the exact time that the recording was made. Further, the appellant has failed to cite any authority in support this argument. As such, this issue is waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). Regardless, a trial court's ruling on the authentication of evidence will not be overruled absent an abuse of discretion. See State v. Arnold L. Jones, No. M1999-00851-CCA-R3-CD, 2000 WL 1843415, at *4 (Tenn. Crim. App. at Nashville, Dec. 14, 2000). We conclude that the trial court did not abuse its discretion in admitting the audio recordings.

## 2. Relevancy

The appellant next contends that because the State could not definitively prove when the microcassette recording was made, the recording was not relevant. In the alternative, the appellant argues that if the recordings were relevant, their probative value was outweighed by the potential prejudice. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

The appellant claims that because there was no proof at trial to indicate that the recordings were made shortly before the fatal shooting of the victim they were not relevant to show what happened shortly before the victim's murder. We disagree. In his statement to Investigator Nessly, the appellant said that approximately twenty to thirty minutes before the victim was shot, he went to their former residence at 140 Sam Burlison Road. The appellant explained, "I had a propane tank that the valve in it was leaking or busted or something and you could smell propane in the house so I decided to take it over there and throw it out over there." The appellant admitted that he had previously "put the tape recorder in various spots while I was gone to see, you know, what was going on to see if she was actually having an affair." He stated that he was "really not sure" of the last place the recorder was placed, but thought the last place was "in the bathroom under some dirty clothes." The appellant told Investigator Nessly that the night of the fatal shooting was the last time that he had recorded the victim's activities. He said that he placed the recorder in the bathroom at approximately 1:30 or 1:45 a.m. The appellant maintained, "[T]hat was where she was supposed to be at while I was gone." Additionally, he stated that as he came in the apartment, he heard the victim in the bathroom, letting water out of the bathtub.

At trial, Investigator Nessly stated that he found a microcassette recorder in the living room floor near the victim. No other cassette tapes were found in the apartment. On the recording, the appellant can be heard telling the victim that he was going to set out a tank. The victim told the appellant that she was going to bathe while he was gone. The recording then has the sounds of water running and splashing. Next, the appellant's voice is heard. The appellant sounded angry and confrontational, jumping from topic to topic. The victim was confused. The appellant stated, "You know what. Goddamn piece of paper right there. With the shit about Hunter on it. Her boyfriend, her lover, the casual sex mom." The victim asked the appellant what he was talking about. He replied, "This right here. . . . That ain't been there. One more time. One more time. I'm fixing to put an end to this. You think this is a game?" A mechanical click can then be heard on the recording. Thereafter, the victim responded, "I don't think this is a game. I swear. . . . [P]lease stop."

The trial court overruled the appellant's objection to the introduction of the recordings. The court stated:

> The proof up to this point has been that the recording device with the tape in it was found at a place that would be material for the jury to hear what was on the recording device. The [appellant] in his statement to the police indicated that he recorded the events of that night. The Court believes that gives substance from which a jury could find, if it chooses to find, that the recording is of events of that evening.

We agree with the trial court. There was ample proof that the contested recording was made immediately prior to the fatal shooting of the victim. Accordingly, the recording was highly relevant to the proceedings. Additionally, while the evidence is prejudicial, we conclude that the probative value of the evidence outweighed such prejudice. Moreover, even if the recording was not made immediately prior to the fatal shooting, the evidence is still relevant as to the relationship between the parties. The jury was free to determine the weight to assign to the evidence. See State v. Billy Murrell Meeks, No. 01C01-9308-CC-00248, 1994 WL 548714, at *10 (Tenn. Crim. App. at Nashville, Oct. 6, 1994).

After Shelton Robinson testified at trial that he made a CD of the enhanced version of the microcassette recording, the State attempted to introduce exhibit 25, which exhibit was a short recording of three repetitions of the mechanical click which was on the original recording of the argument the appellant had with the victim. Specifically, the State said that Robinson would testify that the exhibit contains

> the audible click that is heard on the last recording, that he has culled from the entire CD, and this contains just the click itself. There's a little bit of voice of the [appellant] in front of it and a little bit after it,

-18-

and it's looped three times. So we basically have a little speak, click, a little speak, click, a little speak, click, and that's what he'll testify it is.

During a jury out hearing, Robinson explained to the court that the click portion of the original recording lasted two and one-half seconds. The recording of three repeated clicks lasted seven and one-half seconds to eight seconds. The appellant objected to the introduction of this exhibit on the basis of relevance. The trial court overruled the objection. On appeal, we conclude that this recording was relevant to the proceedings. It was up to the jury to determine the weight to assign to this exhibit.

## D. Mistrial

The appellant next challenges the trial court's denial of his motion for a mistrial. After the State played the recordings purportedly relating to events that occurred just prior to the fatal shooting of the victim, including the recording in which the mechanical click was looped to repeat three times, the State recalled Investigator Nessly to the stand. The State asked Investigator Nessly to demonstrate how to load the revolver that was found at the scene. The appellant objected and requested a bench conference, at which the following colloquy occurred:

> [The appellant]: I don't know, Judge, but I'm afraid he's about to ask him if he can duplicate the sound, that's what I was trying to cut short and get the court to rule on. I may be wrong.
>
> [The State]: I'm sorry. What did you say?
>
> [The appellant]: I stated I thought that you were about to try to ask the witness to duplicate the sound or express an opinion about something.
>
> [The State]: No, I'm not going to ask for his opinion on anything.
>
> [The appellant]: All right.
>
> The Court: The Court will allow the demonstration.

The State again asked Investigator Nessly to demonstrate the loading of the weapon. As he was demonstrating, Investigator Nessly stated that a person would put the rounds into the cylinder and then close the cylinder.

Later in the trial, the appellant moved for a mistrial based upon Investigator Nessly's "manipulation" of the revolver. The appellant argued:

Frankly, Judge, it didn't occur to me that [the State] was going to go further and request that the witness simulate the loading in the manner in which he manipulated and demonstrated the weapon, with all of the attendant mechanical clicking sounds that that entailed as he opened the cylinder and snapped it shut some two or three times.

So I would move the Court for a mistrial. I believe that that conduct on the part of the prosecution was inappropriate. That's the most charitable way I can put it. I believe it was in direct contravention of what this Court ruled that they could and could not do. And I think it prejudiced the accused because already the jury heard the recording with this sound on it; later the jury heard, over our objection, a replay of a portion of the recording which had a sound which I have called a mechanical sound. In fact, they heard that sound three times, which incidentally is the number of times that Mr. Nessly opened the cylinder and snapped it shut. He did it three times in succession.

And so for all those reasons, that's the basis of my motion relative to that issue.

The trial court overruled the appellant's motion for mistrial, finding that the State had complied with the earlier ruling of the court in that the State did not ask Investigator Nessly about his opinion concerning the nature of the clicking sound. The court also noted that the demonstration of loading the revolver was permitted by and consistent with the ruling of the court. On appeal, the appellant challenges this ruling.

A mistrial is a procedural device that is only appropriate when the trial cannot continue without causing a miscarriage of justice. See State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). In other words, there must be a "'manifest necessity'" for a mistrial to be declared. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In conducting our review of this issue, we note that this court has previously found that "[t]he decision of whether to grant a mistrial is within the sound discretion of the trial court. This court will not disturb that decision absent a finding of abuse of discretion." State v. Mathis, 969 S.W.2d 418, 422 (Tenn. Crim. App. 1997) (citations omitted).

In the instant case, we can find no miscarriage of justice or manifest necessity for a mistrial to be declared. The appellant raised the defense of accident. Accordingly, how the pistol was loaded became relevant to refute that defense. See State v. Reid, 164 S.W.3d 286, 344 (Tenn. 2005) (appendix) (approving the use of relevant demonstrative evidence). Further, we note that the State presented no evidence that the jury could not have discovered on its own. Rule 30.1 of the Tennessee Rules of Criminal Procedure provides that the jury is entitled to take all exhibits, except

depositions, into the jury room during deliberations. Therefore, the trial court did not err in refusing to grant a mistrial. This issue is without merit.

## E. Excited Utterance

As his next issue, the appellant asserts that the trial court erred by permitting the State to "impeach an excited utterance made at the scene of the fatal shooting." Prior to trial, the State filed a motion in limine to exclude the statement that Hunter Chapman made to Deputy Walls on the night of the fatal shooting. When Deputy Walls arrived at the Chapman residence, Hunter told Deputy Walls "that his mother and father were fighting and his mother grabbed the gun pointing it at his dad. Hunter then stated that his father took the gun from his mother and then he heard a loud bang. Hunter stated that he ran to his room." The State argued that Hunter's statement was hearsay and that it did not satisfy the requirements for the excited utterance exception to the hearsay rule. Essentially, the State argued that Hunter's statement was inadmissible because he did not have personal knowledge of the events in his statement but was only saying what his father had told him.

The appellant argued that Hunter's statement was admissible as an excited utterance. Further, the appellant contended that the State was not allowed to impeach Hunter's statement to Deputy Walls. In other words, the State was not allowed to have Hunter testify to a different version of events than the one he related to Deputy Walls.

At the hearing regarding the State's motion in limine, Hunter testified that on the night the victim was killed, he was sleeping in his bed when he was awakened by a loud noise. Hunter got out of bed to investigate, and he found the victim lying on the living room floor.[2]

In ruling upon the admissibility of Hunter's statement, the trial court stated that whether the statement Hunter made to Deputy Walls was the result of personal knowledge was ultimately a question for the jury. The court further stated:

> While the Court determines preliminary questions concerning the qualification of a witness to testify, the jury should determine whether the child observed the facts which he stated or whether those facts were suggested. The in court testimony of the child was different from the facts in his statement to the officer. . . . [Hunter's statement to Deputy Walls] seems to indicate personal observation, while the testimony in court seems to indicate he would have to be told those details.

On appeal, the appellant again challenges the State's right to have Hunter testify to a different version of events than was contained in his statement to Deputy Walls, which testimony essentially

---

[2] Hunter's pretrial testimony matched his testimony at the appellant's trial.

serves to impeach his statement to Deputy Walls. Specifically, the appellant states that an excited utterance cannot be impeached.

An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 802(2). "The only competency requirement of an excited utterance under Rule 803(2) is that the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." State v. Land, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000). "In other words, the personal knowledge requirement of Rule 602 applies to excited utterances."[3] Neil P. Cohen et al., Tennessee Law of Evidence, § 8.07[4] (LEXIS publishing, 4th ed. 2000). In the instant case, the trial court implicitly determined that Hunter's statement to Deputy Walls met the test for admissibility under Rule 803(2). We agree. Therefore, we must now determine whether the State was permitted to impeach Hunter's excited utterance.

The appellant cites Williams v. State, 542 S.W.2d 827, 833 (Tenn. Crim. App. 1976), to support his argument. However, we conclude that Williams is inapplicable to the instant case. In Williams, the fatal shooting of the victim was witnessed by two people. Id. at 830. The witnesses saw the distraught victim and the defendant argue about whether the victim would call police to report that they had a fight in which the defendant hit and kicked the victim. Id. The defendant threatened to kill the victim if she called police. Id. The defendant shot the victim when she moved toward the telephone. Id. The State's witnesses stated that after the shooting, "the victim screamed, 'Jimmie, you killed me, you shot me." Id. The victim then staggered into the kitchen where she collapsed and died. Id.

In Williams, the defendant sought to introduce evidence that the victim had previously admitted to being a perjurer. Id. at 832-33. This court concluded that impeaching the victim by a previous confession to perjury was inadmissible because the admissibility of the excited utterance was not dependent upon the victim's veracity; instead, the court explained that in the case of an excited utterance, the declarant is merely the passive instrument for the event itself to speak. Id. at 833.

In the instant case, the State sought to impeach Hunter's excited utterance not by challenging Hunter's veracity but by arguing that Hunter's testimony at trial was the correct version of events, and his initial statement to police was based upon what his father had coached him to say about the shooting. A leading treatise suggests, "With the advent of Rule 806, impeachment of hearsay declarants is freely permissible and there are no artificial limits on the methods of impeaching a declarant who makes an excited utterance." Cohen, supra, § 8.07[6]; see People v. Johnson, 650 N.E.2d 1, 3 (Ill. App. 1995). Tennessee Rule of Evidence 806 provides:

---

[3] Tennessee Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony."

When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

Accordingly, we conclude that the trial court did not err in allowing Hunter to testify at trial.

### F. Closing Argument

As his next issue, the appellant contends that "the trial court err[ed] by overruling the [appellant's] objection to the prosecution's closing argument that the bullet found in the [appellant's] bedroom was a trophy." The appellant also contends, "The closing arguments of the prosecutors are replete with active misleading of the jury as to proper inferences it might draw from the evidence, appeals to the passions and prejudices of the jury in order to suggest an improper basis for its decision, and reference to matters outside the record."

In its initial closing argument, the State maintained that the shooting of the victim was not accidental. To support this contention, the State pointed out:

> [H]e's fired this weapon before. He fired it five days prior. He fired it out of anger over his wife. He fired it while she's sitting on the couch next to him, and then keeps the bullet, as if it's some sort of trophy, and had to put it over the headboard of the bed.[4]

The appellant objected "to the reference to trophy." The appellant argued that "[t]here's no support in the evidence of any such thing." The State responded, "It's argument, Judge." The court overruled the objection, stating, "The Court will allow the argument." After the court's ruling, the State again argued, "He puts the bullet on the headboard like it's some kind of trophy to remind her of where her place is, an everyday reminder of what's going to happen to her if she gets out of line."

Then, in rebuttal closing argument, the State, without further objection by the appellant, argued that the appellant was a controlling individual. The State contended that the appellant's controlling nature was evidenced by his recording of the victim's behavior whenever he was out of the apartment and his control of the family car. Further, the State asserted:

---

[4] The appellant's statement to Investigator Nessly reflects that the bullet was "on the stand of the bed in the master bedroom."

Because we know that he was a controlling person. We know that he was capable of physical violence that very day against her, by choking her. We know that he was someone capable of intimidation and control by shooting into a couch in which she sat. Five days before, on the Thursday before this Tuesday statement given to Investigator Nessly, he admitted or stated to the investigator that he had fired that very handgun.

And as was mentioned by General Campbell, what was done with the bullet? I submit this is of some importance to show somebody in control, somebody to whom accidents don't normally happen. . . .

Now, what is the significance of this? It's the marital bed. The bullet was fired out of the gun that killed Amanda Chapman. The bullet was fired, according to [the appellant], into the couch while she was sitting there. What do you do with such a bullet when you lose your temper and shoot it into the couch? One would think, unless you were trying to intimidate and control somebody, that you'd throw it away. What's the point of keeping it? [The appellant] put it on the marital bed. He put it here by the mirrored headboard, where every night when she went to sleep she could see what would happen to her if she got out of line.

Now, that's not an accident. That's not somebody subject to an accident.

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

"(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]

-24-

(2) the curative measures undertaken by the court and the prosecution[;]

(3) the intent of the prosecutor in making the statement[;]

(4) the cumulative effect of the improper conduct and any other errors in the record [; and]

(5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

On appeal, the appellant specifically complains about the State's references to the bullet from the couch shooting as a "trophy." However, the gist of the appellant's argument is that the State impermissibly commented upon the appellant's reasons for keeping the bullet because there was no evidence at trial to support this argument. We conclude that the State's contention that the bullet was a "trophy" kept to remind the victim not to "get out of line" crossed into impermissible argument. "Expressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment which should separate a lawyer from the cause for which he argues." Goltz, 111 S.W.3d at 6. There is no proof to support the State's contentions regarding the "trophy" bullet, nor is there sufficient proof to make the impermissible inference that the appellant kept the bullet to threaten the victim. Regardless, in light of the strength of the proof against the appellant, we conclude that the error in the argument was harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## G. Jury Instructions

The appellant asserts that the trial court erred in denying his request to remove from Tennessee pattern instruction No. 43.04 the caution to the jury to not let their verdict be swayed by anything but the law and the evidence. Initially, we note that the appellant failed to cite to the record in support of this complaint, arguably waiving the issue. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). Regardless, we will briefly address this issue.

Tennessee Pattern Jury Instruction 43.04 provides:

You can have no prejudice or sympathy, or allow anything but the law and the evidence to have any influence upon your verdict. You must render your verdict with absolute fairness and impartiality as you think justice and truth dictate.

The appellant moved to have the first sentence of the pattern instruction stricken so that the instruction would read: "You must render your verdict with absolute fairness and impartiality as you think justice and truth dictate." The appellant argued:

-25-

Nowhere in the pattern instructions is the jury instructed that it must 'follow' the law; nor is the jury told that it *must* apply the law as given by the trial judge. Instead, the jury is told in the pattern instructions that its duty is to *consider* the law as detailed in the instructions from the court. . . .

. . . [T]he first sentence in T.P.I., No. 43.04, violates the jurors' independent right of conscience in deciding the case. Indeed, the concluding sentence of No. 43.04 explicitly appeals to this very right of conscience by categorically stating that the verdict must be rendered fairly and impartially as the jurors "*think justice and truth dictate*."

The trial court denied the appellant's motion for a modified instruction, finding the motion to without merit. The appellant appeals this decision.

"It is the duty of a trial judge to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). In other words, "a defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). "While the jury is the judge of the facts and the law, it is the duty of the jury to apply the law contained in the charge of the trial court to the ultimate facts determined by the jury." State v. Williamson, 919 S.W.2d 69, 80 (Tenn. Crim. App. 1995).

Essentially, the appellant's contention is that the jury should have been instructed that it could allow sympathy to influence their verdict. However, it is well-established that "[a] trial judge does not err in instructing a jury not to allow mere sympathy or prejudice to influence them in reaching their verdict." State v. Smith, 893 S.W.2d 908, 921 (Tenn. 1994). Moreover, our supreme court has "on numerous occasions upheld the 'no-sympathy' instruction against constitutional attack." State v. Bigbee, 885 S.W.2d 797, 814 (Tenn. 1994), see also State v. Cribbs, 967 S.W.2d 773, 795-96 (Tenn. 1998). Therefore, the trial court did not err in refusing to modify the pattern instruction. This issue is without merit.

## H. Sentencing

As his final issue, the appellant complains that the "trial court err[ed] by directing the jury to return a special verdict and by enhancing the sentence based on the special verdict." In other words, the appellant argues that the trial court erred by conducting a bifurcated proceeding in which the court submitted enhancement factors to the jury for their determination.

After the jury found the appellant guilty of second degree murder, the trial court informed the State and the appellant that

> I propose asking the jury after having found the [appellant] guilty of murder in the second degree, to determine whether or not the following enhancing factors apply, that the [appellant] has a previous history of criminal behavior, yes or no; or the [appellant] possessed or employed a firearm during the commission of the offense.

The court noted that it believed such a procedure was necessary to comply with the recently released Supreme Court opinion Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). The appellant objected to such a procedure, and the trial court overruled the objection. The jury returned from deliberations, finding that both enhancement factors applied. On appeal, the appellant challenges the propriety of the procedure employed by the trial court. The State agrees that the trial court erred by submitting the enhancement factors to the jury but argues that the error was harmless.

At the time the sentencing hearing was conducted, this court had maintained that Blakely "calls into question the continuing validity of our current sentencing scheme." State v. Julius E. Smith, No. E2003-01059-CCA-R3-CD, 2004 WL 1606998, at *4 (Tenn. Crim. App. at Knoxville, July 19, 2004). However, in State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005), a majority of our supreme court recently found that, unlike the sentencing scheme discussed in Blakely, "Tennessee's sentencing structure does not violate the Sixth Amendment." As such, in the instant case, the trial court was not required to submit the enhancement factors to the jury for their determination.

As the appellant and the State correctly maintain, there was no authority for the trial court to rely upon to condone the sentencing procedure the court employed in this case. Regardless, the record shows that both enhancement factors were applicable to the appellant. First, we note that the appellant had a previous misdemeanor conviction. Additionally, medical records introduced by the appellant from his emergency room visit after the fatal shooting reflect that the appellant had used several types of illegal narcotics. Thus, the trial court correctly found that enhancement factor (2), the appellant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," was applicable to the appellant. See Tenn. Code Ann. § 40-35-114(2) (2003). Further, there was no dispute at trial that the appellant employed a gun to shoot the victim, making enhancement factor (10), the appellant "possessed or employed a firearm . . during the commission of the offense," also applicable to the appellant. Therefore, we conclude that the trial court's error in utilizing an unapproved sentencing procedure was harmless.

## III.  Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-27-